**UNITED STATES of America**

**v.**

**OMNI INTERNATIONAL CORPORA-TION (formerly known as Omni Investment Corporation), Wayne J. Hilmer, Evan T. Barnett, Thomas A. Westrick, Jr., and Joseph P. Bornstein.**

**Crim. No. B–84–00101.**

United States District Court,
D. Maryland.

May 15, 1986.

J. Frederick Motz, Former U.S. Atty., D. Md., and Elizabeth H. Trimble, Catherine C. Blake, John G. Douglass, Ty Cobb, and Steven A. Allen, Asst. U.S. Attys., Baltimore, Md., and John R. Maney, Jr. and Ronald Allen Cimino, Attys., Tax Div., U.S. Dept. of Justice, Washington, D.C., for Government.

Paula M. Junghans and Garbis & Schwait, Baltimore, Md., for defendant,

Omni Intern. Corp. (formerly known as Omni Inv. Corp.).

Marvin J. Garbis and Garbis & Schwait, Baltimore, Md., for defendant, Wayne J. Hilmer.

Cono R. Namorato, Bernard S. Bailor, and Caplin & Drysdale, Washington, D.C., for defendant, Evan T. Barnett.

Brendan V. Sullivan, Jr., Barry S. Simon, and Williams & Connolly, Washington, D.C., for defendant, Thomas A. Westrick, Jr.

James E. Merritt, John W. Spiegel, and Morrison & Foerster, Washington, D.C., for defendant, Joseph P. Bornstein.

WALTER E. BLACK, Jr., District Judge.

On March 13, 1984 a grand jury returned a seven-count Indictment against Omni International Corporation, formerly known as Omni Investment Corporation, Wayne J. Hilmer, Evan T. Barnett, Thomas A. Westrick, Jr., and Joseph P. Bornstein. The five defendants each were charged with conspiracy to defraud the Internal Revenue Service, conspiracy to commit income tax evasion, five counts of income tax evasion for the years 1976–1980, inclusive, and aiding and abetting. The Government alleges that Hilmer was the majority owner of Omni and its chief executive officer, and president of Euro Air (a subsidiary of Omni), that Barnett was vice president of Omni and Euro Air, and that Westrick was president of Omni. The Government further alleges that Bornstein, a certified public accountant, prepared or supervised the preparation of the federal income tax returns for Omni.

The defendants promptly filed numerous pretrial motions. All defendants except Bornstein (hereinafter collectively referred to as the Omni defendants) filed motions jointly. Bornstein filed his own motions and also joined in the majority of the Omni defendants' motions. On April 27, 1984, the Omni defendants filed a motion to dismiss the indictment, disqualify government counsel and investigators, and suppress evidence based on violations of the attorney-client privilege (hereinafter referred to as the motion to dismiss). The Government

answered this motion on May 11, 1984. Somewhat contemporaneously, Bornstein filed a related motion to dismiss the indictment based, in part, on governmental misconduct. Additional supplemental memoranda have been received in connection with these motions.

A hearing—which would ultimately require twenty-eight days over an extended period—commenced on June 11, 1984 on all then-pending motions. The immediate focus of the hearing became the Omni defendants' motion to dismiss. Bornstein participated in the hearing in connection with his own motion. Following legal argument on June 11, proffers by the Omni defendants at that time in court and in their pleadings, and the testimony of two witnesses for the Omni defendants on June 12, the Court held an evidentiary hearing on the Omni defendants' motion to dismiss, with testimony before the Court as finder of fact occurring over the course of twenty-eight days between June, 1984 and March, 1985. The record consists of hundreds of exhibits and over 5,500 pages of testimony.

During the course of the hearing the defendants repeatedly asserted that the Government had deliberately set out to breach the attorney-client privilege, and later tried to conceal its actions by misrepresentation, obstruction of justice, and perjury. According to the defendants, subsequent to the Indictment, an Assistant United States Attorney (AUSA) and two agents of the Internal Revenue Service attempted to thwart the Court's inquiry into their misconduct by creating, altering, and suppressing documents, by making misrepresentations to the Court and defense, and by repeatedly lying under oath. For this alleged deliberate, flagrant and repeated misconduct the defendants seek dismissal of the Indictment.

After the Court heard all testimony relevant to the proceedings which the litigants wished to present, proposed findings of fact and conclusions of law were submitted by the Omni defendants and the Government. Bornstein adopted almost all of the

Omni defendants' submissions, as well as submitting his own. The Court heard oral argument on the motion to dismiss on June 25, 1985, and the matter was taken under advisement. This opinion constitutes the Court's findings of fact and conclusions of law.

## I. Attorney-Client Privilege

The basis of the Omni defendants' motion, as originally filed and undoubtedly as originally contemplated by the defendants, was that the Government breached the attorney-client privilege in presenting its case to the grand jury and, thereafter, in preparing for the motions hearing and trial. The requested sanctions for the alleged deliberate breaches are dismissal, disqualification, or suppression. The Government has consistently disputed whether an attorney was even involved in the case, given the fact that the privilege related primarily to communications to defendant Bornstein and his dual role as a certified public accountant as well as attorney; whether any confidential communications were breached; and whether any defendant other than Omni is entitled to claim the privilege in any case. The Government has always maintained that the thrust of the motion relates solely to attorney-client privileges which defendants have failed to prove.

### A. Background

In order to appreciate the arguments raised by counsel at this juncture of the proceedings, the Court will briefly discuss the underlying criminal tax case. Omni, a domestic corporation, buys, sells and leases aircraft world-wide. Hilmer is the majority owner and Chairman of the Board. Westrick, a certified public accountant, is President of the company, and Barnett, also a certified public accountant, is financial Vice President. Bornstein, an attorney as well as a certified public accountant, was Omni's outside counsel and tax advisor. For the years in question, 1976–1980, inclusive, Bornstein signed the relevant Omni tax returns.

The Government investigated Omni for a period of years prior to the return of the Indictment, considering various alleged crimes before focusing on tax issues. Enormous manpower and resources were devoted to the effort; the case consumed more than 2000 man-days and required the full-time attention of several investigators. The primary Internal Revenue agents who were involved in the investigation, especially in late 1983 and 1984, will be referred to throughout this opinion as the Special Agent and the Revenue Agent. This Special Agent directed the entire investigation as it drew to a close and prosecutorial decisions were being made. The primary function of the Revenue Agent was to assist the Special Agent. The IRS, through many agents, conducted interviews on three continents. The other principal Government representative involved is the Assistant United States Attorney (AUSA) who supervised the investigation and presented the case to the grand jury. This individual will be referred to as the AUSA throughout the opinion.

The investigation focused ultimately on Omni's wholly-owned Bermuda subsidiary, Euro Airfinance, Ltd (hereinafter referred to as Euro Air). The Government contends that income reported on Euro Air's information returns was properly taxable to Omni and that tax should have been paid in the year that the income was earned. According to the Government, the defendants evaded taxes by falsely reporting income in the name of Euro Air, when the income in fact belonged to Omni, a domestic corporation. Omni allegedly has not paid taxes on millions of dollars of income passed along improperly to Euro Air.

As the Government put its case together against Omni, the attorney-client privilege issue surfaced. Omni claimed the privilege based on its relationship with Bornstein. In particular, in the Fall of 1983 the Government sought production of Bornstein's invoices to Omni in order to trace expenses and tie Bornstein to particular transactions. Omni asserted that those invoices were not producible pursuant to subpoena because they were subject to the privilege. The AUSA filed a motion to compel their production. On November 8, 1983, Judge Joseph H. Young of this Dis-

trict ruled that there was a privileged attorney-client relationship between Bornstein and Omni and that the invoices need not be produced because "statements or correspondence showing the *nature* of the legal services performed are covered by the attorney-client privilege," and the invoices would reveal the "type of work performed by Bornstein for the client and the particular legal matter which Bornstein worked on." (emphasis in original) This was the first—and only—ruling relative to the subject of attorney-client privilege in these proceedings. It is significant that Judge Young considered Bornstein to be an attorney and found that the invoices were privileged. The evidence before the Court is overwhelming that Bornstein acted as Omni's attorney.

At least from that point on, Omni vigorously asserted the privilege. Yet the Government recognized that discussions between Omni and its lawyers were significant with regard to the tax theory of prosecution and undertook to obtain all the information it could. The Government, particularly the Special Agent and the Revenue Agent, attempted to circumvent the privilege. In pursuing their goal, the agents interviewed numerous attorneys who had represented Omni. Notes taken by the agents prior to at least one interview reveal the agents' intent. The first page of notes taken before an interview of William Green shows that the agents planned to ask Green "what did they [Omni] present to him," and "what did he say to them about the law." [1] To ascertain whether Omni had obtained the advice of Green as to several aircraft transactions involving Euro Air, the agents presented the attorney with several "hypothetical" fact patterns, each based precisely upon an actual Euro Air aircraft transaction. The agents took the actual facts of transactions under investigation, converted them to hypotheticals, and asked Green whether or not he had heard these hypotheticals previously. The agents asked the attorney what tax advice he would give in response to the hypotheticals.

In addition to seeking privileged information from Omni attorneys, the agents sought information from former Omni employees. The Government granted informal "pocket immunity" to Samuel Russell, Omni's former assistant controller, and obtained from him letters written by William Green to Bornstein, summarizing tax advice regarding Euro Air. When Russell finally appeared before the grand jury, the AUSA asked questions which related to tax advice given by attorneys to Omni. The agents also granted informal immunity to Seth McCormick, a former Omni controller. Once again, the agents attempted to discover privileged information.

The two most significant events which relate to the attorney-client privilege, as it developed during the evidentiary hearing, involved Bornstein, directly and indirectly. Beginning in July, 1983, Bornstein was represented by the Washington, D.C. law firm of Steptoe & Johnson, specifically Gerald Feffer, James Bruton, and Greg Gadarian. Several meetings occurred between Bornstein's attorneys and the AUSA, with the attorneys attempting to learn what allegations were being made against their client. The investigation continued and the Government considered bringing charges against Bornstein.

Pursuant to Department of Justice regulations, the Tax Division must approve any criminal tax prosecution, with minor exceptions not applicable here. If requested, the Tax Division will provide potential defendants an opportunity to have a conference with an attorney from the Division. This attorney acts as a reviewer of the factual and legal position of the IRS and recommends to his superiors whether or not prosecution should be authorized. The purpose of the conference is to provide the potential defendant an opportunity to demonstrate why prosecution is unwarranted.

---

**1.** The sources of all quoted material in this opinion are either the exhibits or the hearing transcript unless otherwise indicated. However specific citations have been omitted because of the extraordinary volume of the record in this case.

On October 31, 1983, a conference on behalf of Bornstein occurred at the Department of Justice. At that time Bornstein's attorneys attempted to convince the reviewing attorney at the Tax Division, Mark Friend, that the Government lacked a viable theory of prosecution against their client. The AUSA attended the meeting. The meeting was extremely unusual in its scope, length, and candid discussion of the tax issues. Bornstein's attorneys made a full factual and legal analysis during the conference, addressing each area that had been identified by the Government as a matter for concern. Immediately after the meeting, Friend told the AUSA that there was a question in his mind about the basis for proceeding in the case. Friend particularly expressed concern about the sufficiency of the evidence against Bornstein.

The AUSA thereafter contacted Bornstein's attorneys and stated that the IRS agents who had worked on the investigation for several years wished to hear the presentation that had been made at the Justice Department. The AUSA noted that, as a matter of fairness and because the agents had spent three years developing a case, the conference at Justice should be "replayed" for the agents. The request struck the attorneys as unusual in their collective careers, but they consented to a replay of the October 31st conference.

Such a meeting took place on November 18, 1983. Bornstein's attorneys began by presenting the reasons why they believed the Government's theory of the case against their client was legally untenable. Early in the meeting the IRS agents began arguing with the attorneys, questioning their interpretation of the law. The tone of the meeting became argumentative and heated. For the first time, the Special Agent raised issues concerning alleged documents in Bornstein's safe deposit box that could be used to blackmail Hilmer. If such documents existed, they would demonstrate Bornstein's knowledge of and participation in fraud being committed by his clients. Defense counsel were upset that a new allegation was being raised for the first time at such a late date. Bornstein's attorneys impressed upon the Government that it lacked any witness against Bornstein and thus a case in which the Government had to prove criminal intent would inevitably fail. Defense counsel responded to the allegation of the safe deposit box by stating: "You don't have a witness that implicates Bornstein, you don't have a witness." The meeting ended acrimoniously.

On November 22, 1983, only two weeks after Judge Young upheld Omni's privilege claim with regard to the invoices, and two business days after the meeting occurred with Bornstein's attorneys, the Special Agent and Revenue Agent travelled to the residence of Sandra Poe Wilkins, a former secretary to Bornstein. The decision to interview Wilkins was made in response to challenges by Bornstein's attorneys that the Government was operating on innuendo and did not have a witness against Bornstein. The agents arrived unannounced, presented a grand jury subpoena to Wilkins that had been prepared on November 21, and offered Wilkins, in lieu of appearing before the grand jury, an opportunity to talk directly with the agents. Wilkins consented and the agents then interrogated her for at least five hours. The agents specifically questioned her about her knowledge of Bornstein's activities and what advice Bornstein had given to Omni.

Subsequent to the interview the agents prepared a typewritten memorandum which purported to relate the substance of the matters discussed. According to the memorandum, which at that time was not disseminated to anyone other than the AUSA and other IRS investigators, Bornstein clearly had knowledge of criminal activities undertaken by the Omni defendants. According to the memorandum, Bornstein told Wilkins that in the event anything ever happened to him, he had documents in a safe deposit box which would prevent Omni from pinning anything on him. Wilkins also made several statements that appear to be privileged.

Following the interview the AUSA informed Bornstein's attorneys that the interview had created serious problems for their client. The AUSA arranged a meet-

ing for the Special Agent and the Revenue Agent to inform the attorneys of the evidence that Wilkins had provided to the agents during the interview. When the "debriefing" actually took place on December 15, 1983, the agents provided few details. Bornstein's attorneys stated that there were no incriminating documents in any safe deposit box. The Special Agent said that it was frustrating to deal with the attorneys, instead of directly with Bornstein. At the meeting, the agents did not volunteer the information about the Wilkins interview as Bornstein's counsel had anticipated. The Special Agent stated that he did not want to disclose the substance of the Wilkins interview and then said words to the effect: "I hope I am not stepping on any toes here [turning to the AUSA], but it would be really helpful to me to see Mr. Bornstein respond to these questions." Bornstein's counsel avoided the issue and asked further about the safe deposit box. The Special Agent later repeated his request to speak directly with Bornstein. The AUSA then also stated that "I thought we would get a chance to talk with Mr. Bornstein at some point."

To summarize this sequence of events, the desire of the AUSA, Special Agent, and Revenue Agent to talk with Bornstein intensified after the October 31st conference. Bornstein's attorneys had demonstrated a weakness in the case against their client. The AUSA, Special Agent, and Revenue Agent knew that Friend had concerns about the case, particularly with the lack of evidence against Bornstein. They knew that information was needed if the case was going to go forward. Their witness would be either Wilkins or Bornstein himself.

On the advice of his attorneys, Bornstein consented to make a proffer as suggested at the December 15 conference. On December 23, 1983, Bornstein's attorneys filed an application with the Court for an order permitting an off-the-record proffer to the Government. The application sought permission to disclose attorney-client confidences and other information necessary to defend himself against the proposed criminal indictment. Authority for the proffer was found in a portion of the Code of Professional Responsibility, DR 4–101(C)(4), which permits an attorney to disclose confidential communications made to him by a client in the attorney's own self-defense: "A lawyer may reveal ... [c]onfidences or secrets necessary ... to defend himself or his employees or associates against an accusation of wrongful conduct." This provision affects the limitations otherwise imposed on the attorney by the attorney-client privilege. The Omni defendants vigorously challenged Bornstein's right to make a proffer and requested the opportunity to intervene, to be heard with respect to the scope, if any, of the breach of the attorney-client privilege, and to limit the use of any privileged disclosures which may have been made.

On January 12, 1984, after hearing arguments from Omni, Bornstein, and the Government, Judge Young issued an opinion setting forth the procedures that he would require Bornstein and the Government to follow for the proffer. Judge Young, again recognizing that Bornstein was an attorney, allowed the proffer to proceed but only under certain conditions "which will ensure that the rights of the attorney's former clients are not compromised, or that, if they are compromised, the clients will be able to seek appropriate remedies." Judge Young ruled that

The government will be ordered to submit to the Court for *in camera* inspection by January 16, 1984, a list of the questions and the general areas of inquiry it wishes to pursue with the attorney. The attorney will then have until January 23, 1984, to submit to the Court, again for *in camera* inspection, his responses to the questions propounded by the government. At that point, the Court will issue a ruling on the appropriate areas of inquiry, and the proffer of evidence may proceed, as long as the inquiry does not stray from the bounds set by the Court. The proffer of the evidence presented by the attorney will be stenographically recorded and the record will be sealed pending further order of the Court. The preliminary *in*

*camera* inspection will afford the Court the opportunity to determine that the inquiry is relevant, and that the disclosure by the attorney does not exceed that allowed by Disciplinary Rule 4–101(C)(4).

Judge Young subsequently ruled on February 7, 1984 that "the purpose of the inquiry is for Mr. Bornstein to attempt to convince the government that he should not be indicted and that the questions asked of Mr. Bornstein, and his responses to those questions, are to be used for no other purpose."

The Omni defendants appealed Judge Young's ruling to the United States Court of Appeals for the Fourth Circuit. On February 8, 1984, argument before the appellate court concerned whether Judge Young's order should be stayed pending formal appeal. On March 5, 1984 the Fourth Circuit denied the stay. That Court approved the procedures enumerated by Judge Young, recognizing that Bornstein was an attorney, but that the procedures protected the confidentiality of the attorney-client privilege.

Bornstein, in fact, made a proffer to the Government on March 9, 1984. After the proffer the Government determined that Bornstein was not credible. Four days later the grand jury returned an indictment against Omni, Hilmer, Westrick, Barnett, and Bornstein.

### B. *Conclusions*

█ The above-described events constitute the sum and substance of the major alleged breaches of the attorney-client privilege. Most of the alleged breaches—such as the statements of the two former controllers of Omni who allegedly revealed privileged information—were known to the Omni defendants even before the hearings began. Under close examination it is clear that the alleged breaches of the privilege do not rise to the level at which this Court would consider dismissal of the indictment or disqualification of the AUSA or the IRS agents. It is doubtful whether, in any event, dismissal of the indictment would be appropriate for breaches of the attorney-client privilege, no matter how flagrant the intrusion. *See United States v. Morrison,* 449 U.S. 361, 101 S.Ct. 665, 66 L.Ed.2d 564

*reh'g denied,* 450 U.S. 960, 101 S.Ct. 1420, 67 L.Ed.2d 385 (1981); *United States v. Gatto,* 763 F.2d 1040, 1046 (9th Cir.1985).

In light of the limited showings made by the defendants during the hearing, this Court need not address at length the law of attorney-client privilege. The purpose of the privilege is to encourage free consultation and the complete and unimpeded flow of information between clients and their counsel, thereby "promot[ing] broader public interests in the observance of law and administration of justice." *Upjohn Co. v. United States,* 449 U.S. 383, 389, 101 S.Ct. 677, 682, 66 L.Ed.2d 584 (1981); *Fisher v. United States,* 425 U.S. 391, 403, 96 S.Ct. 1569, 1577, 48 L.Ed.2d 39 (1976). Nonetheless, because the privilege "impedes the investigation of the truth," it "must be strictly construed." *United States v. (Under Seal),* 748 F.2d 871, 875 (4th Cir.1984). In the Fourth Circuit, the privilege "is not 'favored' and is to be 'strictly confined within the narrowest possible limits.'" *In re Grand Jury Proceedings (John Doe),* 727 F.2d 1352, 1358 (4th Cir.1984).

With respect to every specific communication that is claimed to be privileged, defendants bear the burden of proving each of the following elements:

(1) the asserted holder of the privilege is or sought to become a client; (2) the person to whom the communication was made (a) is a member of the bar of a court, or his subordinate and (b) in connection with this communication is acting as a lawyer; (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceedings, and not (d) for the purpose of committing a crime or tort; and (4) the privilege has been (a) claimed and (b) not waived by the client.

*United States v. United Shoe Machinery Corp.,* 89 F.Supp. 357, 358–59 (D.Mass. 1950); *see United States v. Jones,* 696 F.2d 1069, 1072 (4th Cir.1982). A recent Fourth Circuit decision, *United States v. (Under*

*Seal)*, 748 F.2d 871, distinguishes between public and private transactions in a manner that impacts on the question of privilege: for public transactions, such as filings with the Securities and Exchange Commission, none of the underlying discussions are privileged, because the communications are presumptively made with the expectation of public disclosure; however, for unconsummated, private transactions, such as a potential commercial deal that the client ultimately decides not to pursue, all communications relating thereto remain privileged. As stated in *(Under Seal)*, communications that "relate to contemplated public actions ... do not exhibit a reasonable expectation of confidentiality" and are not privileged. *Id.* at 877. The complexities inherent in this distinction need not concern this Court here.

Defendants have failed to meet the burden imposed on them. The proffer by Bornstein concededly did include matters which reveal confidential communications that ordinarily would be subject to the privilege. But Judge Young and the Fourth Circuit explicitly and specifically approved this procedure. And this procedure appears contemplated by the Code of Professional Responsibility. The Omni defendants do not contend that the Government strayed afar from Judge Young's mandate. The Government has never had access to the proffer. Moreover, the information obtained in the proffer cannot, by the terms of the proffer, be used against Omni at trial.

The other episode to which the parties have given much attention concerns the November 22, 1983 interview of Sandra Poe Wilkins. The Court will later discuss the propriety of the interview. *See United States v. Valencia*, 541 F.2d 618 (6th Cir. 1976). In the context of the motion, however, it is clear that Wilkins revealed no confidential communications. In their Proposed Findings, the Omni defendants identify only two items subject to the privilege. The first is that Bornstein advised Omni to file an amended tax return for an unspecified year, but that Omni refused to do so. The defendants show only the statement and do not show enough surrounding infor-

mation for the Court to conclude that the statement is even privileged. Similarly, the defendants fail to show that Wilkins' statement that "Omni sought legal advice about the formation of aircraft registry in Liberia" was privileged. Wilkins' own testimony at the hearing indicates that she divulged nothing of any significance. The Government certainly tried to breach the privilege in its interview of Wilkins, but it failed.

The Omni defendants also place great weight on the number of interviews undertaken by the IRS of various Omni attorneys. The mere fact of an interview of an attorney who rendered legal advice is not controlling. No authority has been cited to the Court for the proposition that it is misconduct for a Government agent to interview an attorney, and to ask questions which relate to legal advice. In fact, in *United States v. Rogers*, 751 F.2d 1074, 1080 (9th Cir.1985), the Court found no misconduct in an interview of an attorney conducted by an IRS agent. In *Rogers*, the legal advice given by the attorney to the target of the investigation was the subject of the agent's questions.

Additionally Omni must demonstrate "not only that an attorney-client relationship existed, but also that the particular communications at issue are privileged and that the privilege was not waived." *United States v. Jones*, 696 F.2d at 1072. Omni has failed to do so.

Attorneys are cognizant of the limits of the privilege. Attorneys are better informed than investigating agents on the applicable law and particular facts presented to them to make judgments about compliance with the attorney-client privilege. Attorneys will not readily disclose confidential communications. This Court is confident that attorneys possess the ability to defend vigorously their clients' interests, even when interviewed by government agents. *See, e.g., United States v. Rogers*, 751 F.2d 1074; *United States v. Rasheed*, 663 F.2d 843, 854 (9th Cir.1981), *cert. denied sub nom. Phillips v. United States*, 454 U.S. 1157, 102 S.Ct. 1031, 71 L.Ed.2d

315 (1982); *In re Walsh,* 623 F.2d 489, 495 (7th Cir.), *cert. denied,* 449 U.S. 994, 101 S.Ct. 531, 66 L.Ed.2d 291 (1980); *United States v. Wolfson,* 558 F.2d 59, 66 (2d Cir.1977). Therefore, when the agents asked a former Omni attorney questions in the form of hypotheticals, as opposed to direct issues, the attorney was fully capable of protecting any privileged information and would have declined to answer the hypotheticals if an answer would have violated the privilege. The agents may have set out to breach the privilege, by asking the attorney about advice he gave his client, but it then becomes incumbent on the attorney either to refuse to discuss the matter in an interview or to testify before the grand jury, or to risk a civil suit against him for revealing confidential communications.

With respect to other interviews, in some situations the defendants have failed to identify what communications were even made. Alternatively, the nature of the matters discussed clearly falls within the ambit of *(Under Seal),* and therefore is not privileged.

In sum, the extent to which the attorney-client privilege may have been violated, if at all, does not compel the conclusion that the indictment should be dismissed, or that Government prosecutors or investigators should be disqualified. Later in this opinion, *see infra* section III, the Court will discuss whether evidence should be suppressed.

## II. *Prosecutorial Misconduct*

The Omni defendants' motion, which began as a not atypical pretrial motion to dismiss the indictment, changed as the hearing progressed; it became a motion to dismiss based largely on government misconduct committed before this Court during the hearing itself. Government misconduct, possibly rising to the level of perjury and obstruction of justice, became the real essence of the motion. At the outset of the hearing, the defendants brought into question the Government's conduct in the investigation, particularly focusing on various documents. During the course of the extended hearing, that conduct became the

focus of the hearing and the most troubling matter to the Court.

There are three general categories of concern into which all relevant issues fall, albeit with some overlap: documents altered or created after the Omni defendants' motion was filed and the attorney-client privilege issue was raised; incorrect testimony before the Court, along with the criminal allegations of perjury and obstruction of justice, largely in connection with the documents referred to in the first category; and, a disheartening lack of candor in colloquies with and testimony before the Court.

### A. *Documents*

The first area of grave concern to the Court involves the creation and alteration of documents which were subsequently turned over to the defendants in preparation for the hearing. Particularly troublesome is the timing of the preparation of the documents, namely after an issue was raised in litigation, and the failure of Government personnel to state candidly what had been done.

The Omni defendants filed their motion to dismiss on April 27, 1984. The motion, along with then-pending discovery requests, directed the Government's attention to possible violations of the attorney-client privilege. The Government then embarked on a project of generating documents which would respond to the issues. In so doing, the Government ultimately produced ten relevant documents. The memoranda relate to interviews conducted by Government agents with the following individuals on the following dates:

*Defendants' Exhibit 4:* Interview of William Green (a New York attorney who met with Bornstein at a public conference in 1980 and later met with Bornstein and certain Omni officers) on September 15, 1983.

*Defendants' Exhibit 5:* Interview of William Green on August 24, 1983.

*Defendants' Exhibit 6:* Interview of John Campbell (a Bermuda attorney and a director of Euro Air) on July 25, 1983.

*Defendants' Exhibit 7:* Interview of Sandra Poe Wilkins (Bornstein's former secretary) on November 23, 1983.

*Defendants' Exhibit 8:* Interview of Sandra Poe Wilkins on November 22, 1983.

*Defendants' Exhibit 9:* Interview of Martin Redler (an accountant employed in Bornstein's accounting office) on September 7, 1983.

*Defendants' Exhibit 11:* Interview of Martin Redler on August 24, 1982.

*Defendants' Exhibit 12:* Interview of Samuel Russell (former controller of Omni) on February 23, 1983.

*Defendants' Exhibit 21:* Interviews of Seth McCormick (former controller of Omni) on August 20, 1981, November 5, 1982, and August 5, 1983.

*Defendants' Exhibit 35:* Interviews of David Candler (former controller of Omni) on April 28, 1982 and February 29, 1984.

At least nine of these documents, and probably all ten, were either created or altered by Government personnel after the defendants filed their motion and before the hearings began on June 11, 1984. The Government filed its answer to the motion on May 11, 1984. In that response the Government represented that it had "provided all defendants with all memoranda in its possession reporting the substance of those interviews". That representation was incorrect. After the filing of this answer the Government continued to generate and produce memoranda of interviews.

Between the time when the Omni defendants filed their motion and the Government filed its response, Government personnel altered a typewritten memorandum of the November 22, 1983 interview of Sandra Poe Wilkins (Defendants' Exhibit 8). A preexisting version of the interview memorandum, which eventually surfaced in various. individuals' files during the hearings, had been initially prepared by the Special and Revenue Agents the week after Thanksgiving, 1983. The document was certainly finalized before December 15, 1983. The final version was delivered to the AUSA in charge of the case and Mark Friend, the reviewing attorney at the Tax Division of the Department of Justice. The 1983 version of the memorandum mentions that Bornstein wrote memos to Omni concerning the taxability of controlled foreign corporations. It then states: "The contents of those memos were not discussed due to the attorney/client privilege." The altered version of the memorandum, prepared between April 30, 1984 and May 8, 1984, states: "We told Wilkins that we did not want to discuss the contents of those memos due to the attorney-client privilege." The change from passive to active voice in this sentence made the agents appear sensitive to the very issues raised in the hearing.

A second document altered during this time frame was an interview memorandum concerning one of the attorneys contacted by the agents, William Green (Defendants' Exhibit 5). Reference has previously been made to this interview because, in the course of that interview, the agents posed "hypothetical" aircraft transactions. In the preexisting version of the memorandum prepared shortly after the interview on August 24, 1983, it is clear that hypotheticals posed to Green were actually based on five specific aircraft transactions that were the subject of the Government's investigation and which are encompassed in the Indictment. The memorandum suggests that Green was "hesitant" to discuss details of his conversations with Omni officials because of possible violations of the attorney-client privilege, and that he "therefore" provided general information. The memorandum indicates that the agents were interested in obtaining the specific information provided to Green by his clients, and the specific advice he would have provided in response.

In the altered version the memorandum states that during the "meeting" with Green, "he would not" discuss the details of his conversation because of the possible violation of the privilege. This modification attempted to put the conduct of Government personnel in a better light and the question of breach of the privilege during the interview in a different perspective.

There is no reference to any particular aircraft in the altered version, which simply refers to "hypothetical sales" described in general terms. The altered version also adds the sentence that Green "never stated an opinion as to whether the [hypothetical] sales were taxable or non-taxable." No corresponding statement exists in either the preexisting version of the memorandum or the handwritten notes of the interview.

A third altered memorandum is of an interview of Samuel Russell on February 23, 1983 (Defendants' Exhibit 12). A preexisting, nine page version of that memorandum was prepared in 1983. An altered, seven page version was prepared after April 27, 1984. The Government concedes that the changes are not merely grammatical corrections, but do involve matters of substance. First, the last paragraph of page three of the preexisting version describes a meeting between Omni personnel and Green. After a statement that Green spent about one day in Omni's office and discussed the foreign taxation laws, the memorandum states that "Russell said that Omni's officers appeared to be concerned and shaken by what they had heard." In the altered version, the phrase "appeared to be concerned and shaken by what they had heard" is deleted.

The pre-existing version also states:
Russell said that during all the conferences with attorneys and discussions concerning the foreign corporation he asked Bornstein how things had gotten so 'fouled up'. Russell said that by this he meant the several issues which he had noted during the course in New York and they had discussed previously such as the improper reporting of airplane sales on the books and records of Euro Airfinance.

This paragraph suggests more than one conference between Russell and Bornstein about matters getting "fouled up." It also specifically indicates that there were not only conversations during the conferences at New York, but also previous discussions concerning reporting of aircraft sales on the Euro Air books. The altered version states, by contrast:

Russell said that during the return flight from New York following the accounting course, he asked Bornstein how things had gotten so 'fouled up.' Russell said that by this he meant the several issues which he had noted during the New York course and discussed above such as the improper reporting of airplane sales on the books and records of Euro Airfinance.

The interview memorandum of Seth McCormick (Defendants' Exhibit 21), was certainly prepared after the indictment. In all likelihood the document was prepared after the attorney-client privilege issue was raised. After the motion was filed the AUSA instructed the agents to insert the three dates borne on the document. Without dates the defendants would have reasonably assumed that the memorandum was based on one undated interview. With the three dates, however, the defendants could reasonably have assumed that the compilation memorandum constituted all of the interviews of McCormick.

Although none of the above described changes are earth-shattering, they do involve matters of substance. The appearance of sensitivity to attorney-client privilege questions mattered greatly to the Government. Subtle shifts in tone, such as the statement that "We told Wilkins that we did not want to discuss the contents of those memos due to the attorney/client privilege" instead of "The contents of those memos were not discussed due to the attorney/client privilege," could have been significant to the Court. In any event, the Court condemns the practice of altering and revising documents once the matter is in litigation without disclosure that such an alteration had occurred. The impropriety was not corrected by providing the underlying notes and preexisting memoranda under pressure during the course of these proceedings; it was wrong for Government personnel to so act, and the Government's action was aggravated by its reticence in stating what had been done.

Compounding the major error in producing altered documents without an explana-

tion of the alteration was the Government's failure to admit its mistake, to candidly inform the Court and defense counsel of the changes, and to minimize the harm done. If defense counsel in a criminal case received a subpoena and made "minor" modifications to the documents sought, allegedly to clarify errors in style and grammar, the Court is certain that the process by which such changes were made would be cause for major concern to the Government, and would probably lead to the threat of criminal prosecution. Whatever the intent might have been in such a hypothetical situation seems quite beside the point; such conduct is wrong and strikes at the heart of fundamental values in our adversary system of justice.

Justice cannot function in a system in which one side feels free to make even minor modifications which only aid its position slightly, without informing the other side of its actions. Trust and confidence in the system would be lacking. Minor modifications today could become significant alterations tomorrow, based on the judgment of the reviser. Prohibiting such action must be the rule whether the changes are made by defense counsel or government counsel. This must be true even when, as here, the underlying documents are finally produced. Our system cannot rely on lengthy evidentiary hearings in which a collateral document search is conducted and the true manner of preparation is exposed. The appropriate documents must be turned over at the outset and in unaltered form.

In addition to *altering* preexisting documents during this time frame, and producing said documents to defense counsel without a representation that alterations had been made, Government personnel *created* typewritten interview memoranda during this period. The typed memoranda were prepared from handwritten notes taken at the time of the interview, but the memoranda were only prepared after defense counsel raised the issue of attorney/client privilege.

The Special Agent initially prepared an interview memorandum pertaining to Martin Redler (Defendants' Exhibit 9) on May 3, 1984, one week after the Omni defendants filed their motion to dismiss. The AUSA edited the document before it was produced to defense counsel on May 8, 1984. The memorandum was based on handwritten notes taken during an interview on September 7, 1983. It bears only the date of the interview and not the date of preparation. From the face of the document it would appear that the memorandum had been prepared in September, 1983, or soon thereafter. Creating this erroneous impression and, worse yet, not correcting the resultant misunderstanding, was wrong.

The IRS earlier had conducted another interview of Redler on August 24, 1982. The Special Agent initially dictated the typewritten memorandum (Defendants' Exhibit 11) once again on May 3, 1984. The AUSA again reviewed and edited the document before it was produced to the defendants on May 8, 1984. The typewritten version bears only the date of the interview and ordinarily one might assume from this date that the memorandum had been prepared contemporaneously with the interview. Once again, the Government failed to properly inform defense counsel that the document had been prepared months after the interview, after the attorney-client privilege issue had been raised. In connection with this document the Government produced during the hearings a draft typewritten version which could not have been initially prepared prior to May 3, 1984. The second page of the draft memorandum reflects that "to the best of Redler's knowledge, Windsor is either working in Las Vegas or Atlantic City at a gambling casino at the time of the interview." The Special Agent changed this sentence to read, in the final version: "to the best of Redler's knowledge, Windsor is currently working in Las Vegas or Atlantic City at a gambling casino." This change could have been made either to clarify an awkward sentence, with the word "currently" inserted to refer to the August 24, 1982 date of the interview, or to suggest to the reader of the document that the memorandum had been prepared contemporaneously with the

interview. In light of the Special Agent's credibility and demeanor as a witness, which will be discussed in greater detail below, the Court finds that this change also was made in an attempt to obfuscate the date of preparation.

By letter to the AUSA dated May 14, 1984 the defense specifically sought information concerning when various memoranda were prepared and by whom, as well as the underlying handwritten notes. The Omni defendants mentioned Wilkins, Russell, Green, and McCormick by name. Following this notification the Government prepared other typewritten memoranda. These memoranda were created after defense counsel specifically inquired about when memoranda were prepared and who prepared them. The Government failed to admit that the documents were created at that very time, specifically in response to issues raised by defendants. One interview memorandum (Defendants' Exhibit 4), relating to a September 15, 1983 interview of William Green, contains statements not found in the handwritten notes of the interview. This memorandum also contains self-serving, editorial comments by the Special Agent which appear to show Government sensitivity to the very issues being raised by defense counsel. The typewritten version states

> We told Green that it was our understanding that he had provided information to Bornstein and Omni for use in preparation of their income tax returns. It was our interpretation of the law that this would not constitute a violation of the attorney-client privilege, although we made several attempts to describe hypothetical situations, Green would not provide any information as to his advice or what advice he would provide to a client had they asked a question similar to the hypotheticals that we described.

The Special and Revenue Agents interviewed Sandra Poe Wilkins, the former secretary to Bornstein, on November 22 and 23, 1983. The alteration of the preexisting version of the November 22, 1983 interview memorandum (Defendants' Exhibit 8) has been previously described. The agents also created a typewritten memorandum, bearing no date of preparation, for the November 23, 1983 interview (Defendants' Exhibit 7). This document was prepared between May 14, 1984 and May 18, 1984.

After the return of the Indictment the Special Agent created a memorandum purporting to summarize discussions with David Candler (Defendants' Exhibit 35). The memorandum omitted Candler's disclosure that commission payments were discussed with an Omni attorney, which potentially would impact on the attorney-client privilege.

The last matter worthy of specific discussion by the Court involves a typewritten memorandum of an interview of John Campbell which had occurred on July 25, 1983 (Defendants' Exhibit 6). This memorandum was in fact prepared no earlier than May 29, 1984, and it bears only the date of interview. On May 24, 1984 the defense issued subpoenae *duces tecum* calling for documents relevant to the motion to dismiss. The subpoenae specifically called for, once again, interview memoranda. On June 6, 1984, the Government filed a motion to quash the subpoenae. The Government represented that all witness statements arguably relevant had been turned over to the defendants. On that same day the Government sent to the defendants an interview memorandum for the Campbell interview. This memorandum was prepared after the motion was filed, the Government had answered the motion, and the defendants made additional specific requests for memoranda by serving subpoenae. Once again, the Government failed to indicate that the document was generated at the very time it was produced.

As was the case with the altered documents, the Court is shocked and dismayed by the Government's approach to document production. It was an egregious error for the Government to create documents and turn them over to defense counsel as if they had been prepared contemporaneously with the interviews. This impropriety was particularly acute because there existed a pending motion to dismiss and request for evidentiary hearing which would be based

on the contents of the memoranda. While it may be appropriate in certain circumstances to create a typewritten memorandum of an interview after an issue is raised in litigation, it is inappropriate not to indicate that just that course of action has been followed.

To summarize, the Government created and altered at least nine, and probably all ten, relevant documents which were the source of the defendants' motion to dismiss after the attorney-client privilege issue surfaced. Production was made without acknowledging that the documents had just been prepared, even though from the face of the documents one could erroneously conclude that the documents were prepared contemporaneously. These errors were exacerbated by erroneous testimony at the evidentiary hearing given by the Special Agent, Revenue Agent, and AUSA, to which the Court now turns.

### B. *Testimony*

The second major area of concern to the Court involves the repeated untrue and incorrect testimony which occurred during the course of the proceedings. The impact of such testimony to this Court, sitting as fact-finder for the evidentiary hearing, cannot be underestimated. Based on the erroneous testimony given, as uncovered during the hearing, the Court simply cannot put its complete trust and confidence in certain Government witnesses. Untrue testimony occurred in connection with the documents created and altered after the motion to dismiss was filed, discussed above. Untrue testimony also occurred in connection with the interview of Sandra Poe Wilkins on November 22, 1983, and with the use of the typewritten memorandum subsequently prepared. Other examples of such testimony will be set forth as the Court continues to make its findings of fact. The sheer magnitude of the erroneous testimony prejudiced the defendants and the Court.

The Special Agent who was in charge of the investigation beginning in the Fall of 1983 took the witness stand for the first time on June 12, 1984. This agent continued his testimony when the hearings resumed in September, 1984. The testimony was wrong in numerous respects. When the agent began to testify in June, the Omni defendants immediately sought to date the preparation of the ten documents. Many of these documents were dictated, prepared, or modified by the agent within the month prior to his testimony. He repeatedly and vociferously, without hesitation or doubt, indicated several of the documents had been prepared in 1983. This testimony was incorrect. The agent also was unwilling to testify as to the dates of preparation of other documents. The Court finds that the agent must have been able to recall documents he had prepared within several weeks of his testimony, and this testimony therefore was inaccurate, and misleading as well. As the evidence unfolded it became clear that at least nine, if not all ten, of the documents in question had been prepared no earlier than May, 1984.

Although tedious, it is necessary for the Court to recount some of the agent's untrue or misleading testimony with regard to the interview memoranda.

Defense counsel asked the Special Agent when Defendants' Exhibit 4, the memorandum of interview of William Green that occurred on September 15, 1983, was prepared. The agent responded: "I can't say exactly. It wouldn't have been within a day or two of the interview ... I don't recall specifically when it was prepared." The questioning continued:

Q: Well was it prepared since the first of the year [1984]?

A: I believe that this one was.... I believe that this particular memorandum was probably prepared sometime this year, but I can't be certain of that.

Q: Was it prepared since the return of the indictment in this case?

A: I believe it may have been, but again I can't say with certainty....

Q: Was there a reason why this memorandum was prepared after the return of the indictment?

A: No, nothing particularly comes to mind as to why it would have been specifically after the indictment.

This testimony was wrong and incomplete; the agent prepared the memorandum in May, 1984.

Testimony was also incorrect with regard to the preparation of the memorandum of interview of Green that had occurred on August 24, 1983 (Defendants' Exhibit 5). When questioned about the date of its preparation, the Special Agent responded: "This memorandum, I believe, was actually prepared by [the Revenue Agent] and I am not certain when this one was prepared." In fact, the Special Agent played a significant role in the editing process along with the Revenue Agent when the document was revised in May, 1984.

Defense counsel asked the Special Agent about the preparation of the Campbell interview memorandum (Defendants' Exhibit 6), which was later proven to have been generated by the agent on May 29, 1984, only two weeks prior to his testimony:

Q: When was this memorandum prepared?

A: Again, I can't say with certainty, Mr. Simon, as to an exact date. In this particular interview, I even had a problem narrowing it down as to some time. It would have been, let me explain it this way if I might, it wouldn't have been a day or two after the interview [which had been conducted on July 25, 1983]. It probably was several months after that, but I believe it was within say several months of that interview.

This testimony was repeated on several occasions.

Defense counsel inquired about the preparation of the second Wilkins interview memorandum (Defendants' Exhibit 7). The interview occurred on November 23, 1983. The agent testified wrongly about when the interview memorandum was prepared: "I think that this was [prepared] just prior to Thanksgiving weekend and that memorandum was dictated, I would say, the following Monday or Tuesday [November 28, or 29, 1983]." This particular document, in fact, was initially prepared between May 14

and May 18, 1984. Similar testimony was given with regard to the other Wilkins interview memorandum (Defendants' Exhibit 8), pertaining to the interview on November 22, 1983. When asked when the memorandum was dictated, the Special Agent testified: "Approximately the same time as the other memorandum [the November 23rd interview of Wilkins], I believe. This would have been within a couple of days of the following week. The memorandum was ... I would say within approximately a week of that time the memorandum was prepared." Defendants' Exhibit 8, in fact, was revised in May, 1984 from a preexisting memorandum.

Similar misstatements were made with regard to the Redler interview memoranda: "[Exhibit 9] was prepared relatively soon after the interview itself, within a week or ten days [September 14–17, 1983]." Furthermore, Exhibit 11

A: would have been prepared probably at approximately the same time as [Exhibit 9] was prepared.

Q: So it was prepared approximately one year after the date of the interview [i.e., August, 1983]?

A: I believe that is correct.

The agent, in fact, dictated both memoranda on May 3, 1984.

Finally, the agent was asked by defense counsel about the preparation of the Russell interview memorandum based on a February 23, 1983 interview (Defendants' Exhibit 12). That memorandum was, in fact, prepared from a preexisting memorandum in May, 1984. Nonetheless, the testimony was as follows:

Q: When did you prepare that memorandum?

A: I couldn't say with certainty.

Q: Was that after the first of the year?

A: I don't believe so. I believe this memorandum was prepared prior to June of '83 and it is dated February 23, '83.

Q: Sometime prior to June but approximately June of '83?

A: No. I am saying between February and June of '83.

The agent further failed to inform the Court of a preexisting memorandum.

The Government minimizes this testimony. According to the Government, the argument made by defendants is that the memoranda were "passed off" as contemporaneous. The Government states that this argument cannot be true. The Government supports its argument by noting that two of the memoranda show on their face that they are not contemporaneous and are, instead, compilations (*e.g.*, Defendants' Exhibits 21 & 35). Although the Government likely did not intend to mislead defense counsel and the Court about the preparation, the simple fact is that no one knew when the documents were prepared. Moreover, when the defendants raised the issue, the Government was unable or unwilling to provide the answers. Even the Special Agent, in attempting to date the documents, stated on at least one occasion that the likely date of preparation related to the date typed on the face of the interview memorandum: in dating Exhibit 12, the Russell memorandum, the agent noted that he believed the date of preparation was "prior to June of '83 *and it is dated February 23, '83.*" (emphasis supplied) The Court therefore rejects the Government's position. The reasonable assumption from the face of the document would be that it had been prepared at roughly the time stated on it.

The Special Agent's untrue testimony was not limited to document production issues. He gave such testimony relating to his diary. The Omni defendants asked the agent whether he kept a daily log or diary of his activities; the defendants were attempting to discover when the documents actually were created. The agent testified that his diaries contained only the number of hours that he worked in a day and did not indicate the substance of his activities. When the Court ultimately ordered relevant portions of the 1983 and 1984 diaries produced, it became clear that this testimony was untrue. The diaries, although sketchy, often indicate that the agent prepared for certain critical meetings, and generated certain interview memoranda at issue in these hearings on particular days.

The other IRS employee who testified at great length during the hearings, and did so falsely or wrongly on many occasions, was the Revenue Agent involved in the case. As was the case with the Special Agent, this witness also had difficulty dating accurately when memoranda were prepared. The Revenue Agent's false testimony extended beyond dating the production of documents, however. One fact issue which arose during the hearings concerned a line in the agent's handwritten notes of the November 22, 1983 interview of Sandra Poe Wilkins. That line stated: "Not discuss contents, atty/client priv." This sentence, if taken to be true, would demonstrate government sensitivity to the privilege.

Defense counsel asked the Revenue Agent as he testified for the first time when this sentence was written. The agent testified adamantly that his notes followed the course of the interview exactly, and that he therefore wrote down the statement as it was spoken. This testimony was clear and unequivocal. It remained unshaken under intense examination by defense counsel. In fact, this testimony was false, and the agent later returned to the witness stand to recant it.

Disturbing, conflicting testimony was also presented. With regard to Exhibit 5, one of the interview memoranda involving William Green, different IRS agents took responsibility for the document's alteration from a preexisting memorandum. The Revenue Agent testified forcefully, during two different appearances, that he alone made the changes without any input or consultation with any other person. According to this version, the changes were made in the Spring of 1984, before the defense motion to dismiss was filed. A different agent testified forcefully that he alone made the changes. This agent testified that the changes were made prior to October 1, 1983. In fact, the Revenue Agent made the changes with assistance from the Special Agent between May 8, 1984 and May 18, 1984.

The AUSA who directed the entire investigation and presented the case to the grand jury also gave incorrect testimony. For instance, defense counsel asked about the date of preparation of the November 22, 1983 Wilkins interview memorandum (Defendants' Exhibit 8). The AUSA stated on many occasions that it was prepared soon after the interview; in fact, it was not prepared until May, 1984. Another example of untrue testimony given by the AUSA concerned the use made of the Wilkins interviews in the decision to indict Bornstein. The AUSA testified on repeated occasions that Wilkins' potential testimony was put out of mind, was not presented to the grand jury, and was not part of the decision-making process. However, evidence in the record shows that the AUSA did consider the substance of statements allegedly made by Wilkins against Bornstein.

Perhaps the most flagrant, troubling aspect of the entire tax investigation occurred when the Government interviewed Sandra Poe Wilkins, Bornstein's secretary. The Government contends that there is no impediment, legal, technical, ethical, or otherwise, to an unannounced, uncounselled, surprise interview of a lawyer's secretary when the focus of the interview will be on what the secretary knows about the relationship between the lawyer and his client. Unlike lawyers, who can protect the attorney-client privilege, secretaries have no legal training and cannot be expected to make sophisticated judgments regarding the scope of the privilege. This Court is shocked and offended by such a procedure and condemns this investigatory tactic, especially in the factual situation presented here.

As has already been described in great detail, Omni asserted the attorney-client privilege before Judge Young. On November 8, 1983, Judge Young held that invoices sent by Bornstein to Omni were privileged. Although fully cognizant of this ruling, the Special Agent and the Revenue Agent travelled two weeks later to Wilkins' home for an interview. The AUSA knew such an interview was to occur. The interview also followed by only two business days the conference with Bornstein's attorneys, who had forcefully stated that the case against Bornstein was fatally flawed because the Government lacked a witness. The purpose of the meeting with Wilkins was clearly to find such a witness. In light of this purpose, the proper course of action would have been to subpoena Wilkins before the grand jury and allow Omni an opportunity to intervene.

The Special Agent testified that Wilkins was only interviewed because she was a "loose end", "for no particular reason", and as part of "unfinished business." This testimony was certainly misleading and probably false. Even the agent's diary reflects that he spent twelve hours on the day preceding the interview preparing for it.

Subsequent to the interview of Wilkins, the agents prepared a memorandum which purported to summarize statements made by Wilkins. As has already been detailed, the Revenue Agent added at least one line to his notes at a later point in time, to wit: "Not discuss contents, atty/client priv." At the evidentiary hearing Wilkins testified that the contents of the memorandum read like a novel to her and were largely false. Only at the hearing did it emerge that the agents had related certain facts to Wilkins which, according to the agents, Wilkins confirmed and, according to Wilkins, she denied. In either event the memorandum makes it appear as if Wilkins made certain statements, which she did not.

The most damaging episode to Bornstein related in the memorandum consisted of statements to the effect that Wilkins had corroborated the allegation about the safe deposit box. According to the memorandum, Wilkins stated that Bornstein had a safe deposit box which held United Aviation Services documents. The documents purportedly demonstrated that Bornstein had properly advised his clients and that the clients ignored the advice. Paragraph 17 of Exhibit 8 states that if Omni "ever tried to pin anything on him [Bornstein], he had proof that he advised them the correct way to do it and they didn't." Wilkins

denied these statements at the hearing. She testified that the only document known to her in Bornstein's safe deposit box was his will.

The significance of the memorandum is that it is not entirely and fully accurate. At the time, however, Bornstein's counsel did not know the true situation; they were unable to speak with Wilkins and they did not receive a copy of the memorandum.

Another issue that arose concerned who delivered a copy of the earlier version of the Wilkins November 22, 1983 interview memorandum to Mark Friend, the Department of Justice Tax Division attorney who reviewed the case. Friend testified that the document was brought to him at his office in Washington, D.C. by the Special Agent, Revenue Agent, or AUSA, or some combination thereof. None of the three witnesses admitted to delivering the document during their extended testimony; all three denied doing so. Someone clearly gave the document to Friend, however, and it would appear that at least one of the witnesses testified falsely in that regard. When the memorandum was delivered, the person who delivered it made a comment to the effect that "this was really good stuff, it was really dynamite." From this statement, the Court finds that it appears most likely that the Special Agent delivered the memorandum. But it is not necessary to conclusively determine who actually delivered the item. The crucial fact is that there was, once again, false testimony.

On the basis of this continuous stream of incorrect, misleading, and false testimony, the Omni defendants charge that the three individuals committed perjury and obstructed justice. It is neither the role nor the function of this fact-finder in the context of a pretrial motions hearing to make findings of criminal conduct. Throughout the lengthy proceedings the Government has focused its attention on the alleged breaches of the attorney-client privilege, and not on allegations of perjury and obstruction of justice. The Government has not "defended" the Special Agent, Revenue Agent, or AUSA against these charges; these three persons are not on trial for the alleged crimes in any case. Clearly it would be imprudent for this Court to draw the conclusions requested by defendants.

It would also be unnecessary to do so. The *motive* involved in this case is irrelevant to the Court's disposition of the matter. The critical fact is that there was a considerable amount of false, wrong testimony. At issue here are not merely a few, isolated incidents that can be shrugged aside due to the passage of time and length of the hearings. The Court can easily understand innocent misrecollection. But the effect of this testimony and the obvious prejudice which resulted cannot be so easily dismissed. It will be evaluated *infra* in section III of this opinion.

Having reached these conclusions, the Court does express its view that the AUSA did not commit perjury and did not obstruct justice. The Court is left with a sufficient reasonable doubt on these criminal questions, even without a defense being mounted on behalf of the AUSA. The Court is satisfied that the AUSA had become so immersed in the prosecutorial role and so protective of the Government's handwritten interview notes that it was impossible for the AUSA to give proper attention to the enormity of what was being done. Testimony given by the AUSA certainly was untrue and wrong in certain places. However the criminal intent required by law has not been proven. The Court further notes that it makes no findings at all with regard to the criminality of testimony given and conduct undertaken by the Special Agent and the Revenue Agent.

### C. *Lack of Candor*

The third area of the Court's concern may be described as lack of candor. It is clear beyond any doubt that misrepresentations were made to the Court, from the beginning of the evidentiary hearing. Misrepresentations occurred in colloquies with the Court and in testimony by witnesses. The Court recognizes that events about which certain witnesses testified often occurred several years prior to the hearing. Nonetheless there was virtually a wholesale failure of recall of critical events by

the relevant Government witnesses, and no such failure by the defendants' witnesses. At the least this failure constitutes a lack of candor. The primary (but not sole) offender is the AUSA.

At the outset of the hearing on June 11, 1984, extensive discussion concerned whether the agents' handwritten notes should be produced to the defendants. On June 11th, the AUSA argued that the Government's motion to quash the Omni defendants' subpoenae should be granted because all memoranda had been produced and there was no need to obtain the handwritten notes. The AUSA did proffer the notes to the Court for *in camera* inspection. However, the AUSA did not inform the Court at that point that all memoranda had been prepared or altered within six weeks of the hearing. Nor was the Court informed that there were preexisting versions of some altered memoranda in the files. If the Court had been so informed, it undoubtedly would have ordered the immediate production of the underlying documentation. Instead, the Court reviewed the handwritten notes *in camera* that evening. On June 12, 1984, the Omni defendants called two witnesses to demonstrate the need for an evidentiary hearing. These witnesses addressed the typewritten memoranda pertaining to interviews to which they had been either a party or a witness, and they basically testified that the memoranda were false, misleading, and incomplete.

A crucial colloquy which evinces lack of candor began between the Court and the AUSA after the witnesses testified and the defendants renewed their request for handwritten notes:

> THE COURT: Clarify for me, ... if you will, first of all, under what circumstances did the Government give the typewritten statements to the Defendants? Was this in response to some Motion? Was it totally voluntary? Did you take the position that you didn't have to produce them but nevertheless were going to voluntarily? What were the circumstances under which they were turned over?

The AUSA responded that the purpose of the hearings was to give the defendants an opportunity to show that the privilege was breached:

> AUSA: We realized that they could not make a factual showing ... unless they had the actual statements that were made. Accordingly, we provided the memoranda which we believed were—which there couldn't be any questions that might have mentioned attorney/client dealings so that they could then make a factual showing to the Court.... But we provided the memoranda to them to enable them to prepare themselves for the hearings yesterday and today.

In this statement the AUSA did not indicate that the memoranda were given to the defendants precisely in response to the motion to dismiss or that all the memoranda had then been created or altered. The Court then naively asked a second question which addressed what became the critical issue concerning the preparation of the documents:

> THE COURT: Well, now is there significance in themselves to the fact that they are typed, if one of these would have been handwritten, would you all have taken the position that was not producible?

A candid answer would have fully apprised the Court of the activities that had recently been undertaken. The AUSA, however, gave a totally nonresponsive answer to the inquiry:

> AUSA: Your Honor, it is a matter of practice within the Government, I assume, that the notes are taken, contemporaneous notes are taken by the agents as well as from time to time by the attorneys in the case during the course of an interview. And, then memoranda are prepared. These memoranda, I guess, are similar, if you are dealing with the Federal Bureau of Investigation, to the FBI 302's, with respect to the DEA they would be the DEA 6's. Underlying all those documents I think Your Honor is aware are the handwritten notes of the agents from which the documents were prepared and I believe the

law in the Fourth Circuit is that those notes do not have to be produced, that the memoranda are what is—

THE COURT: Well, what I am asking you, what if under certain circumstances the government agent does not reduce it to a typewritten report, then would the government take the position because it was never typed up the handwritten one is not producible?

AUSA: No, Your Honor, we would provide the other side with whatever was the official document reflecting that particular interview....

In this colloquy the AUSA failed to inform the Court that the Government had, in fact, been producing typewritten memoranda exactly because none had been prepared. The AUSA also failed to indicate that changes in preexisting reports had been made.

Later in oral argument on the issue of the production of the notes, the Court directed its attention to the Candler memorandum (Defendants' Exhibit 35). Testimony earlier on June 12, 1984 had revealed that certain conversations between the agents and Candler were omitted from the memorandum. The Court went so far as to ask:

THE COURT: Now I am at a loss to understand, unless these papers were prepared solely on the issue of attorney/client privilege, which I am confident is not the fact, how did the conversation get omitted?

The AUSA again failed to correct the obvious assumption made by the Court which was certainly in error, as the AUSA knew; the papers referred to had in fact been prepared solely in response to the attorney-client privilege motion.

The AUSA's failure to be fully candid could have had tragic consequences. The Court was faced with the issue of whether or not to permit an evidentiary hearing. If the Court had blindly relied on the AUSA's representations, no hearing would have been held.

Later in the same day the Special Agent took the witness stand and began his testimony. The Omni defendants immediately focused on the dates of preparation of the typewritten memoranda, item by item. The Special Agent testified either falsely or incompletely, as described earlier. Approximately forty-five minutes into the questioning, the AUSA made the following representation:

AUSA: Your Honor, as far as the Government is concerned, when this dispute was raised as far as the attorney-client privilege was concerned and we felt obligated to provide information to the other side so that they could be prepared for the hearings today, I did, in fact, ask the agents to change their original notes into memoranda so to the extent that it came from me and I knew the Motion had been filed, that is certainly true, and it didn't reflect on the agents at all, it reflects on me as opposed to them that we knew the material had to be turned over and we had to put it into typewritten form rather than handwritten notes.

MR. SIMON: That answers the Court's question earlier if these were prepared in connection with the Motion. Possibly we could find out which of the memoranda were in fact prepared on that basis.

AUSA: That may not be true for all of them. I told the agents to go through their notes and see who that applied to with respect to attorney-client and to the extent there weren't memoranda prepared they were prepared and produced to the other side.

This representation by the AUSA, along with the exchange with defense counsel, is significant to the Court in several respects. First, it shows that the AUSA was not fully candid in the earlier statements to the Court that if no memoranda existed the notes would have been produced. Secondly, it showed that the AUSA was involved directly in the creation and alteration of the documents. Thirdly, the representation along with the qualification finally made by the AUSA left the issue murky; even when the AUSA finally addressed the matter, there was not a full response to the issues.

The Government has consistently relied on these representations by the AUSA for the proposition that the record had then been made clear and the defendants then possessed all the knowledge relevant to the legal issues. Under examination it is clear that the statements in themselves are neither complete nor candid. The defendants sought to know exactly when documents were created and altered and by whom. At the time that these questions were originally posed, no one but the Government knew the answers. And, the Government throughout the hearings never gave the answers. The facts were made available to the Court only through extensive investigation on behalf of defendants and many days of hearings.

Without belaboring the lack of candor exhibited by several Government witnesses during the hearing, the Court does wish to note that the AUSA was not candid during portions of testimony given from the witness stand. The AUSA testified that there was never a possibility at the Department of Justice that the prosecution would be declined. This testimony was incorrect. Friend testified that not only did such a possibility exist but that he so informed the AUSA on December 15, 1983.

However significant the lack of candor with the Court may appear in this one interchange, the AUSA was less than candid in another, perhaps more significant way. One of the primary issues in the hearings involved the process by which Bornstein made his proffer to the Government, which has been discussed above. During these hearings Bornstein's former counsel testified credibly about the procedure. Bornstein became interested in making a proffer only after the Government reported that Sandra Poe Wilkins had given statements which were damaging to him.

In attempting to convince the courts that a proffer ought to proceed, the Government maintained that Bornstein sought the opportunity to make a proffer and that the Government, in the interests of treating all potential defendants fairly, wished to give Bornstein that opportunity. In its answer to the motion to dismiss, the Government implied that Bornstein virtually begged the Government for this option. The facts concerning the proffer are much more complex. For quite some time the Special Agent wanted to hear what Bornstein might want to say. Prior to the meeting of December 15, 1983, the AUSA clearly had always wanted to talk to Bornstein, because he was the return preparer. The Government was willing to make any efforts necessary because, according to the AUSA, "[we] had to talk to him if we in any way could."

The desire to talk to Bornstein only intensified after the conference at the Department of Justice. Bornstein's counsel raised issues that troubled Friend, the attorney at the Justice Department. Bornstein's counsel also hammered home the point on November 18, 1983, that the Government lacked a witness against their client. Both the AUSA and the Special Agent were frustrated in dealing indirectly with Bornstein's attorneys instead of directly with Bornstein himself. On December 15th, prior to the meeting with Bornstein's counsel, the AUSA had a discussion with Friend. According to Friend's notes of that conversation, the AUSA "is trying to figure a way to get testimony from Bornstein, ... agree[ing] that we must know what he will say." At the December 15, 1983 meeting, the Special Agent on two occasions and the AUSA at one point both suggested the viability of a direct discussion between Bornstein and the Government.

Unlike the AUSA who refused or declined to relate candidly the Government's approach towards Bornstein, the government investigator assigned to the United States Attorney's Office stated that "the key is Bornstein, if he flips and tells the truth, they're all dead, we plead this thing out, that kind of thing." If Bornstein did "flip", "it would be a cakewalk for the rest of the case."

The Special Agent, Revenue Agent, and especially the AUSA were less than candid in relating the proffer procedure and the Government's actual motive for the prof-

fer. This Court does not condemn the Government's motive; it does, however, take issue with the manner in which the real motive was obfuscated before Judge Young, the Fourth Circuit, and this Court. True candor would have at least revealed the Government's mixed motives, as described above. The Court notes that none of the three Government representatives recalled the momentous meeting of November 18, 1983, at which time Bornstein's attorneys gave a replay of the Justice Department conference, at the specific request and for the benefit of the agents. The AUSA had virtually no recall of this meeting, beyond "being in the room." The Special Agent recalled nothing about a "replay" or of a meeting with Feffer in November, 1983, even though his diaries reflect that he spent thirty hours in preparation for the November 18th meeting on the three days prior to that meeting. The Revenue Agent also had no recollection of the meeting. This is particularly surprising because the tone of the meeting was acrimonious and heated, with voices raised and with some of the participants pounding on the conference table.

None of the three recalled the December 15, 1983 meeting, the purpose of which was to debrief Bornstein's attorneys on the statements allegedly made by Wilkins. The Special Agent could not recall the purpose of the meeting, nor of a meeting at which time the Wilkins memoranda was to be discussed. The Special Agent also stated he had no recollection of saying that he wanted to speak directly with Bornstein. The Revenue Agent purported to recall nothing of the meeting; he, however, did at least recall a statement that the Special Agent "would like to question Mr. Bornstein personally." The sum of the AUSA's testimony was lack of recollection at all.

The lapse of memory disappoints the Court and evidences a lack of candor by these three witnesses. Confirmation of these meetings and the events transpiring within was made by Bornstein's attorneys and the investigator in the United States Attorney's Office.

### III. *Sanctions*

Having set forth at length the three principal areas of concern to the Court that occurred during the course of the hearings, namely the alteration and creation of documents, false and incorrect testimony, and a lack of candor in colloquies with and testimony before the Court, the question becomes what sanction, if any, is appropriate. The Omni defendants request, in the alternative, dismissal of the indictment, disqualification of government prosecutors and investigators, and suppression of evidence. Each sanction will now be treated separately.

### A. *Dismissal*

 The issue of dismissal of the indictment is not an easy one. Federal courts have a general supervisory power with respect to the administration of justice in federal judicial proceedings. *See United States v. Hasting*, 461 U.S. 499, 505, 103 S.Ct. 1974, 1978, 76 L.Ed.2d 96 (1983); *United States v. Payner*, 447 U.S. 727, 734–36, 735 n. 8, 100 S.Ct. 2439, 2445, 2446 n. 8, 65 L.Ed.2d 468 *reh'g denied*, 448 U.S. 911, 101 S.Ct. 25, 65 L.Ed.2d 1172 (1980); *McNabb v. United States*, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819 *reh'g denied*, 319 U.S. 784, 63 S.Ct. 1322, 87 L.Ed. 1727 (1943); *see generally* Beale, *Reconsidering Supervisory Power in Criminal Cases; Constitutional and Statutory Limits on the Authority of the Federal Courts*, 84 Colum.L.Rev. 1433 (1984). The use of the supervisory power supports three institutional goals: deterring illegal conduct by government officials, protecting and preserving the integrity of the judicial process, and implementing a remedy for violation of recognized rights. *See United States v. Hasting*, 461 U.S. at 505, 103 S.Ct. at 1978; *United States v. Payner*, 447 U.S. at 735 n. 8, 100 S.Ct. at 2446 n. 8; Note, *The Exercise of Supervisory Powers to Dismiss a Grand Jury Indictment—A Basis for Curbing Prosecutorial Misconduct*, 45 Ohio St.L.J. 1077, 1084 (1984). Within limits, federal courts may formulate procedural rules not specifically required

by the Constitution or the Congress. *United States v. Hasting,* 461 U.S. at 505, 103 S.Ct. at 1978.

Courts have dismissed criminal prosecutions because of serious government abuse in the investigation leading to the indictment. *See United States v. Kilpatrick,* 594 F.Supp. 1324, 1352–53 (D.Col.1984); *United States v. Lawson,* 502 F.Supp. 158, 170 (D.Md.1980); *United States v. Dahlstrum,* 493 F.Supp. 966, 974–75 (C.D.Cal. 1980), *appeal dismissed,* 655 F.2d 971 (9th Cir.1981), *cert. denied,* 455 U.S. 928, 102 S.Ct. 1293, 71 L.Ed.2d 472 (1982). Moreover, courts have dismissed indictments because of serious government misconduct following the indictment. *See United States v. Pollock,* 417 F.Supp. 1332, 1348–49 (D.Mass.1976); *United States v. DeMarco,* 407 F.Supp. 107, 115 (C.D.Cal.1975); *United States v. Banks,* 383 F.Supp. 389, 397 (D.S.D.1974), *appeal dismissed sub nom. United States v. Means,* 513 F.2d 1329 (8th Cir.1975).

■ If the defendants demonstrate actual prejudice, the indictment can be dismissed under the supervisory power. *See, e.g., United States v. McKenzie,* 678 F.2d 629, 631 (5th Cir.), *reh'g denied,* 685 F.2d 1386 (5th Cir.), *cert. denied,* 459 U.S. 1038, 103 S.Ct. 450, 74 L.Ed.2d 604 (1982); *United States v. Nembhard,* 676 F.2d 193, 200 (6th Cir.1982). Yet the defendants maintain that no showing of harm to them is required to justify dismissal pursuant to the supervisory power. The Government argues by contrast that actual prejudice must be shown, because even where violations of *constitutional* rights are at issue dismissal is inappropriate absent demonstrable prejudice to defendants.

The courts have not definitively resolved whether an indictment can be dismissed pursuant to the supervisory power absent prejudice to the defendant. The Supreme Court has not squarely addressed the issue. However, the Court made clear in *United States v. Morrison,* 449 U.S. 361, 101 S.Ct. 665, 66 L.Ed.2d 564, *reh'g denied,* 450 U.S. 960, 101 S.Ct. 1420, 67 L.Ed.2d 385 (1981), that dismissal of an indictment is inappropriate under the sixth amendment even if

the violation is deliberate, absent demonstrable prejudice or a substantial threat thereof. The recent pronouncements of the Court in *Payner* and *Hasting* imply a more limited use of the supervisory power, possibly including a requirement of actual prejudice for dismissal. *See United States v. Lehr,* 562 F.Supp. 366, 371 (E.D.Pa. 1983), *aff'd without opinion,* 727 F.2d 1100 (3d Cir.1984). These decisions, however, leave intact the well-settled proposition that the supervisory power still exists for "truly extreme cases." *United States v. Broward,* 594 F.2d 345, 351 (2d Cir.), *cert. denied,* 442 U.S. 941, 99 S.Ct. 2882, 61 L.Ed.2d 310 (1979).

A review of circuit court decisions shows disarray on the requirement of prejudice, with the full significance of the *Payner* and *Hasting* rulings not yet evaluated. The Fourth Circuit has yet to speak on the question. The decision by the Ninth Circuit in *United States v. Rogers,* 751 F.2d 1074, 1077–79 (9th Cir.1985), is representative of those circuits which suggest that prejudice must be shown: *United States v. Acosta,* 526 F.2d 670, 674 (5th Cir.), *cert. denied,* 426 U.S. 920, 96 S.Ct. 2625, 49 L.Ed.2d 373 (1976); *United States v. McKenzie,* 678 F.2d 629; *United States v. Crow Dog,* 532 F.2d 1182, 1196–97 (8th Cir.1976), *cert. denied,* 430 U.S. 929, 97 S.Ct. 1547, 51 L.Ed.2d 772 (1977); *United States v. Brown,* 602 F.2d 1073, 1076–77 (2d Cir.), *cert. denied,* 444 U.S. 952, 100 S.Ct. 427, 62 L.Ed.2d 323 (1979). A contrary line of authority exists. The following courts have concluded that an indictment can be dismissed in the absence of prejudice, in extreme circumstances. *See, e.g., United States v. Serubo,* 604 F.2d 807, 817 (3d Cir.1979); *United States v. McCord,* 509 F.2d 334, 349 (D.C.Cir.1974), *cert. denied,* 421 U.S. 930, 95 S.Ct. 1656, 44 L.Ed.2d 87 (1975). The Eleventh Circuit has not yet determined whether prejudice is required. *See United States v. Pabian,* 704 F.2d 1533, 1540 (11th Cir.1983).

■ In resolving the obvious divergence among the authorities, a few salient points emerge. The supervisory power may be

invoked in a myriad of situations based on the peculiar circumstances presented. It should be exercised sparingly and only on a showing of demonstrated and longstanding prosecutorial misconduct, *see United States v. Adamo*, 742 F.2d 927, 942 (6th Cir.1984), *cert. denied sub nom. Freeman v. United States*, —— U.S. ——, 105 S.Ct. 971, 83 L.Ed.2d 975 (1985), just as reversals of convictions under the supervisory power must be approached "with some caution." *United States v. Hasting*, 461 U.S. at 506–07, 103 S.Ct. at 1979. *See also United States v. Artuso*, 618 F.2d 192, 196–97 (2d Cir.), *cert. denied* 449 U.S. 861, 101 S.Ct. 164, 66 L.Ed.2d 77, 449 U.S. 879, 101 S.Ct. 226, 66 L.Ed.2d 102 (1980); *United States v. Fields*, 592 F.2d 638, 648 (2d Cir.1978), *cert. denied*, 442 U.S. 917, 99 S.Ct. 2838, 61 L.Ed.2d 284 (1979). Sparing use, of course, does not mean no use. Even "disfavored remedies", *United States v. Rogers*, 751 F.2d at 1076–77, must be used in certain situations. Exercising the inherent authority is most appropriate in particular fact situations that do not lend themselves to rules of general application. *United States v. Harrison*, 716 F.2d 1050, 1053 n. 1 (4th Cir.1983), *cert. denied sub nom. Wissler v. United States*, 466 U.S. 972, 104 S.Ct. 2345, 80 L.Ed.2d 819 (1984).

■ A common thread underlying many decisions is that the magnitude of the misconduct affects the use of the supervisory power, whether or not actual prejudice is shown. *See, e.g., United States v. Serubo*, 604 F.2d at 818 (prosecutorial conduct extreme; graphic and misleading reference by prosecution to Cosa Nostra hatchet men); *United States v. Hogan*, 712 F.2d 757 (2d Cir.1983) (misconduct flagrant); *United States v. Fischbach & Moore, Inc.*, 576 F.Supp. 1384, 1396 (W.D.Pa.1983) (isolated incident of misconduct). In determining the proper remedy pursuant to the supervisory power, the relief chosen should be directly related to the seriousness of the misconduct. *United States v. Banks*, 383 F.Supp. at 392. Repeated instances of deliberate and flagrant misconduct justify dismissal of the indictment. *See id.; United States v. Hogan*, 712 F.2d at 761; *United States v. Kilpatrick*, 594 F.Supp. at

1352–53; *United States v. Lawson*, 502 F.Supp. at 172.

Exhaustive research reveals no case in which Government personnel committed repeated misconduct in so many forms as has occurred here, at the preindictment stage, the discovery stage, and in hearings before this Court. In light of the Supreme Court's general statements concerning the purpose for which the supervisory power was created and that Court's sensitivity to the need to invoke the doctrine to promote fairness and assure justice, the supervisory power must be utilized in this case. Court decisions emphasize the unifying premise in all of the supervisory power cases—that although the doctrine operates to vindicate a defendant's rights in an individual case, it is designed and invoked primarily to preserve the integrity of the judicial system. *United States v. Leslie*, 759 F.2d at 372. The Court has particularly stressed the need to use the supervisory power to prevent the federal courts "from becoming accomplices to such misconduct." *United States v. Payner*, 447 U.S. at 744, 100 S.Ct. at 2451 (Marshall, J., dissenting). Utilization of the supervisory power remains a harsh ultimate sanction, but must be used for "conduct that shocks the conscience." *United States v. Baskes*, 433 F.Supp. 799, 806 (N.D.Ill.1977) (quoting *Rochin v. California*, 342 U.S. 165, 172, 72 S.Ct. 205, 209, 96 L.Ed. 183 (1952)).

Factually, the misconduct here is not isolated, but longstanding. Indeed untrue testimony and a lack of candor permeated the entire ten-month hearing. The Government did not proffer the truth about the creation and alteration of the documents during all that time. The misconduct here is as extreme as any found in the reported decisions reviewed by this Court. Defendants and the Court clearly suffered prejudice from the misconduct. Whether or not there is prejudice, the supervisory power to have any significance must be applicable to cases of repeated, flagrant governmental misconduct. In light of all the testimony adduced at the evidentiary hearing, it is clear that this case rises to the high threshold imposed for invocation of the supervi-

sory power. The Court condemns the manner in which the Government proceeded, and cannot now stand idly by, implicitly joining the federal judiciary into such unbecoming conduct.

As reviewed in detail above, the Court is deeply troubled by the manner in which the Government handled the submission of documents to defense counsel and the Court, and in the evidentiary hearing before the Court. It simply is wrong for Government personnel to act as they have done here. This type of conduct cannot and must not be condoned; in fact, it must be strongly condemned. The Court has not set forth the details of the prosecutorial abuses lightly and without regard to the individuals involved.

When oral argument on the motion was held on June 25, 1985, the Government did concede that it was wrong to prepare memoranda as had been done. But the Government recommends almost a "harmless error" approach as a sanction for this egregious error, contending that no harsh remedy should follow because all underlying documents were finally produced to the defendants.

The Court rejects this notion. Absolutely no justification exists for revising documents that are being turned over to an adversary in litigation once the issue has been raised, particularly without notice of revision to the opposition. The Government offers no excuse, other than to maintain that the changes were made for the sake of accuracy. However, the unrevised documents were apparently sufficient for review by the Department of Justice as it decided whether or not to approve the prosecution. The only possible conclusion that the Court can reach is that changes were made to strengthen the Government's position at the hearing, even though the effect of the alterations was minimal. Similarly, there is no justification for creating documents during this time period, without indicating so, no matter what the motive.

The Government's argument overlooks one critical consequence that would have resulted if the Government's representations and the documents had been accepted at face value: there would have been no hearing, and the truth would have never been known. As tragic as are the events which transpired during the evidentiary hearing, it would have been even worse for the Court to have denied the defendants a hearing. The fact that all the relevant documents were finally produced only occurred because of the Omni defendants' strenuous efforts.

▇ It is neither reasonable nor proper to change, alter, correct, modify, or create documents once a matter is in litigation, especially absent notice to opposing counsel. This rule must apply equally to the Government as it does to defendants. The rule applies irrespective of alleged good faith.

The Court is equally troubled by the consistent pattern of false testimony and lack of candor exhibited by various Government representatives who played prominent roles in this tax investigation. The details have already been recounted. This Court has considered carefully the large volume of disturbing testimony on a whole range of issues.

▇ The Court finally is extremely disturbed by the Government's cavalier attitude with regard to a surprise interview of an attorney's secretary, when the purpose of the interview will be to discover communications between the attorney and his clients. If no legal precedent presently exists· in reported cases to proscribe such outrageous conduct, one needs to be added at this time. This investigatory tactic is patently improper. A grand jury appearance would be a preferable approach; in any event, before such an interview is conducted, court approval should at least be obtained.

The case closest to this issue is *United States v. Valencia*, 541 F.2d 618 (6th Cir. 1976). In *Valencia*, a lawyer's secretary was also a paid government informant. The secretary had been present when various narcotics transactions occurred; she had also been instructed by her employer to take notes during that time for the pur-

pose of defending one of the clients on smuggling charges. At trial, the secretary testified. After learning that the secretary had become a paid government informant during the investigation, the district judge dismissed the indictment as to four of the defendants, including the attorney. The basis for dismissal was the outrageous governmental intrusion into the attorney-client privilege. On appeal, this determination was affirmed: "We agree with the district court that it was improper for the government to have intruded into an attorney-client relationship by paying an attorney's secretary for information about his clients." *Id.* at 623. This was true even though the attorney was directly involved in a criminal conspiracy with his clients, because "the law in its majesty ... [cannot] be equally slimy." *Id.* at 621 (quoting the District Judge).

■ The Court finds the Government's intrusion in the Omni investigation equally intolerable. This is not a situation in which a secretary cooperates with the Government in an investigation and informs the attorneys and clients involved to proceed accordingly at their own peril. *See United States v. King,* 536 F.Supp. 253 (C.D.Cal. 1982). *Valencia* also stands for the proposition that the secretary's testimony, when so obtained, cannot be admitted at trial. It follows that the testimony of Wilkins would be inadmissible at any trial involving Bornstein or his clients.

■ Thus, in exercising the supervisory power entrusted to it to ensure the smooth and proper administration of justice, the Court has determined that the indictment should be dismissed. Twenty-eight days of hearings produced example after example of conduct unbecoming to the Government. Innocent misrecollection by witnesses is a common occurrence and is excusable, but the cumulative effect of the evidence presented here adds up to more than innocent misrecollection. Defendants should not be forced to conduct lengthy hearings to learn the basic essential facts needed as a predicate to a pretrial motion. Courts should not be forced to question whether government witnesses are testifying truthfully and fully. The Government's conduct was patently egregious and cannot be tolerated or condoned. Its manner of proceeding shocks the Court's conscience. The indictment must be dismissed as a prophylactic sanction for the consistent course of entrenched and flagrant misconduct. *United States v. Birdman,* 602 F.2d 547, 559 (3d Cir.1979), *cert. denied,* 444 U.S. 1032, 100 S.Ct. 703, 62 L.Ed.2d 668, 445 U.S. 906, 100 S.Ct. 1084, 63 L.Ed.2d 322 (1980).

However, the Court does not take lightly the fact that an impartial grand jury indicted these five defendants on serious criminal tax charges. This grand jury was completely untainted by and ignorant of the matters of significance to the Court. Therefore, the indictment will be dismissed without prejudice. Although defendants have certain rights which have been violated here, they have no concomitant right to bar forever investigation into their alleged criminal conduct. *United States v. Lawson,* 502 F.Supp. at 172. The Court recognizes that the passage of time may have caused the statute of limitations to run as to certain tax years charged in the Indictment. This fact does not affect the decision to dismiss the Indictment without prejudice.

B. *Disqualification*

■ In the event that the Government decides to seek another indictment in this matter, an issue undoubtedly will arise about whether any of the Government prosecutors or investigators should be disqualified. Based on the misconduct described in detail throughout the opinion, this Court has determined that the Special Agent, the Revenue Agent, and the AUSA involved in this litigation must not participate further in the prosecution of the case.

C. *Suppression*

The last sanction requested in the Omni defendants' initial motion relates to the suppression of evidence. Had it not dismissed the indictment, the Court might have concern over what evidence ought to be suppressed. In light of the Court's dis-

position, the issues are greatly simplified, and will need to be addressed only in the event of reindictment.

The Bornstein proffer need not be suppressed because its use has already been limited by rulings of Judge Young and the Fourth Circuit. Statements made by Sandra Poe Wilkins need not be suppressed here; although the Court condemns the investigatory technique utilized to obtain the interview of Wilkins, her testimony during the hearings demonstrated clearly that the Government will be unable to use her as a trial witness. If Wilkins should be proffered as a witness at a future trial, the full ramifications of *United States v. Valencia*, 541 F.2d 618 (6th Cir.1976), can be explored. All other issues relating to the suppression of evidence based on violations of the attorney-client privilege can be raised during a future trial, if then appropriate.

The Court will enter a formal order dismissing the indictment without prejudice.