**UNITED STATES of America**

v.

**Wayne ADONIS a/k/a Mark Payne.**

**Crim. No. 88–0358–01.**

United States District Court, District of Columbia.

Aug. 2, 1990.

William J. O'Malley, Asst. U.S. Atty., Washington, D.C., for U.S.

Jensen Barber, Washington, D.C., for defendant.

## MEMORANDUM

HAROLD H. GREENE, District Judge.

This case is here for resentencing and for a determination whether a departure

from the Sentencing Commission guidelines is warranted.

## I

Defendant Wayne Adonis and his co-defendant Garfield Scott were indicted on September 15, 1988, for drug conspiracy in violation of 21 U.S.C. § 846 and for possession with intent to distribute more than fifty grams of cocaine base in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A)(iii). The latter offense carries a statutory minimum sentence of ten years, and the guidelines issued by the Sentencing Commission require a sentence of at least twelve and one-half years.[1] Subsequently, the government filed a superseding information, charging the defendants instead with conspiracy pursuant to 18 U.S.C. § 371, which carries a maximum penalty of five years, without a mandatory minimum, and both defendants ultimately pleaded guilty.

When Scott came up for sentencing, the Court found that, based upon his offense conduct, the guidelines prescribed a sentence of between 121 and 151 months.[2] In view of the five-year maximum prescribed by section 371 of the Code, Scott was sentenced to that term of imprisonment.[3]

On February 9, 1989, Adonis appeared before the Court for sentencing. It became quickly apparent that, as between the two defendants, he was by far the less culpable, on several bases. By Scott's own admission, the cocaine found in the house belonged to him rather than to Adonis.

Cocaine in Adonis' possession (in his lap) was actually thrown at him by Scott at the very time of the police raid.[4] Adonis' persistent claim that prior to Scott's arrival at the house where the cocaine was found, he was unaware of any illegal drug scheme is corroborated not only by Scott's unequivocal assumption of responsibility for the drugs, but also by the fact that Adonis resides in New York and had apparently just arrived in Washington, D.C., for a visit. Further, Adonis, unlike Scott,[5] does not have a criminal record involving drugs.[6]

At the time of sentencing, the Court deemed that it was unfair and inconsistent with the principle of individualized treatment that, when confronted with two co-defendants, they be given identical sentences, if one was patently far less involved with the offense than the other, had a far less active role, and had not been involved in drug trafficking in the past. Accordingly, the Court concluded that, in view of the differences between Scott and Adonis with respect to guilt, knowledge, limited intelligence, background, and participation in the offense, Adonis should receive a three-year sentence where Scott had been sentenced to five years. The prosecution insisted that, in obedience to section 5G1.1(a) of the guidelines (*see* note 3, *supra*), the Court was required to impose a five-year sentence on Adonis irrespective of the difference in culpability and the other differences between the two defendants.[7]

---

1. *See* note 2, *infra.*

2. Based on the amount of drugs involved, a base level of 34 was applicable, translating into a sentence of 151–188 months, for one with a criminal history category of I. With a two-level reduction for acceptance of responsibility, defendant's exposure was reduced to a range of 121–151 months.

3. The Sentencing Commission guidelines provide that, if the guideline sentence exceeds the statutory maximum, the statutory maximum becomes the appropriate guideline sentence. *See* Guidelines § 5G1.1(a).

4. A second packet of cocaine was found on the sofa where Adonis was sitting. He has consistently denied knowing anything about that packet, and as indicated above, Scott admitted ownership thereof.

5. At the time of his sentence, Scott was facing trial on a drug charge. Adonis' only record is an arrest in 1988 in New York for grand larceny and possession of stolen property, but the charges were "adjourned in contemplation of dismissal."

6. Additionally, the description of Scott in his presentence report suggests that he is a far more sophisticated individual than Adonis, and one who has assumed leadership roles in other situations.

7. The Court also took note of the fact that the prosecution had seen fit to reduce the criminal charges from offenses calling for a minimum confinement of over twelve years, as returned by the grand jury, to a single charge with a five-year maximum. Since this reduction was inconsistent with the actual offense conduct, which should have been the basis for the

It is worthy of note in this connection that under the sentencing guidelines, one who has a minor or minimal role in the offense compared to others is normally entitled to a reduction from the sentence otherwise appropriate. *See* section 3B1.2(a), (b) of the guidelines. However, under section 5G1.1(a), possibly due to an oversight, there is no adjustment for major or minor roles and participation. The Court's sentence of Adonis was designed to apply the general philosophy of the guidelines with respect to minor or minimal participants,[8] as well as the philosophy underlying equal protection and sentencing fairness.

The government appealed, and the Court of Appeals reversed, noting that this Court's reasons for its departure from the guideline sentence were not clear from the transcript of the sentencing hearing, and it returned the case to this Court for resentencing.[9] 891 F.2d 300 (D.C.Cir.1989).

## II

On May 17, 1990, in compliance with the mandate of the Court of Appeals, this Court held a new sentencing hearing. In the course of that hearing, defendant, *inter alia*, requested a departure from the guideline sentence pursuant to section 5K2.13 on grounds of diminished mental

capacity,[10] and his counsel stated that he would obtain an evaluation by a psychologist with respect thereto. There then occurred a series of events characterized by a determination by the prosecution to proceed with its evaluation of defendant exactly how and when it wished, irrespective of any other considerations.

On May 24, 1990, the prosecution moved for an order directing the defendant to submit to a government-sponsored psychiatric and psychological examination in addition to the psychological examination arranged for by the defense, and it requested that defendant be transported for that purpose to the Federal Correctional Institution at Butner, North Carolina, and committed to the psychiatric ward there for a period of forty-five days. On June 15, 1990, the Court granted the government's motion for such examinations, but it denied the request that they be conducted at the Butner penitentiary, explaining that, contrary to the government's assumption that the examination had to be "of the type utilized in determinations of guilt or innocence," a less comprehensive examination was indicated since the results were to be used in the context of a sentencing hearing, rather than in a trial.[11] On June 28, 1990, the

charges, *see, e.g.,* guideline section 6B1.2(a), the Court concluded that it was not bound by the strict mandate of the guideline sentence which the prosecution had arbitrarily selected by its new charge, and that it was not foreclosed by this action from taking into account fairness and equality of treatment between co-defendants. *See* text below.

8. Application of the four-level reduction for minimal participation provided for in section 3B1.2(a) of the guidelines to the sixty-month sentence appropriate pursuant to section 5G1.1(a), would have resulted in a sentence close to the three years the Court initially imposed. Under the guidelines, a sixty-month sentence for a person with a criminal history category of I corresponds to an offense level of 25. Deducting four levels from this figure yields a level 21 which provides for a range of 37–46 months.

9. The Court of Appeals was certainly correct in its assessment that this Court's oral remarks did not clearly and comprehensively convey its reasoning as carefully as it is being noted here.

10. Counsel for defendant had raised this issue prior to the original sentencing, but had not

formally moved for a departure based on diminished capacity.

11. The Sentencing Guidelines provide in section 6A1.3 that when a sentencing factor is in dispute, the parties are to be afforded "an adequate opportunity to present information to the Court regarding that factor." However, the Court is not restricted to information that would be admissible at trial, as long as it has sufficient indicia of reliability to support its probable accuracy. *See, e.g., United States v. Fatico,* 579 F.2d 707 (2d Cir.1978). Moreover, the guidelines state that it is up to the sentencing court to "determine the appropriate procedure in light of the nature of the dispute, its relevance to the sentencing determination, and the applicable case law." Commentary to § 6A1.3.

There is no support in the letter or the spirit of the guidelines or the decided cases for the government's suggestion that it has a right to have a defendant committed to the psychiatric ward at a far-away penitentiary as if the proceeding before the Court were akin to a "determination[s] of guilt or innocence." Indeed, such a requirement would effectively moot the

government moved for reconsideration, insisting once again that defendant be committed to Butner for forty-five days,[12] but since this motion offered nothing new, it was denied.

On July 10, 1990, the very date scheduled for the sentencing hearing,[13] the prosecution asked for a continuance on the sole ground that the Assistant U.S. Attorney William O'Malley, Chief of the Narcotics Section of the U.S. Attorney's Office, who had assigned the resentencing proceeding of Adonis to himself, had only just then realized that the hearing was scheduled for that very date.[14] Notwithstanding this failure to show good cause, the Court continued the hearing to the following day in order to provide the prosecution with an opportunity to have its psychological and psychiatric examinations, evaluations, and reports fully completed.[15]

## III

Hearings were held with respect to the issue of diminished capacity on July 13, 16, and 20, 1990. At these hearings, Lanning E. Moldauer, Ph.D., a psychologist,[16] testified on behalf of defendant, and David Shapiro, Ph.D., a psychologist,[17] and Dr. Neil Blumberg, a psychiatrist, testified for the government. Both of the psychologists have extensive background with retarded persons, each having examined several thousand such individuals, having had extensive experience in forensic psychology, and having previously testified as experts in court. Dr. Blumberg, the psychiatrist, was less well versed in the fields of mental retardation[18] and reduced mental capacity, and his testimony was therefore of less value to the Court.[19]

Dr. Moldauer administered a number of standard tests to the defendant, and so did

---

possibility of a departure based on section 5K2.-13 for any defendant who qualified, for he would presumably be declared incompetent to stand trial, or not guilty based on mental incapacity.

**12.** The government on that date also asked for an examination of more than one day, although the evaluation by defendant's psychologist was conducted during such a period. Nevertheless, the Court ruled that the government could take whatever time it wished as long as the evaluation was completed in time for the July 10, 1990 sentencing hearing.

**13.** The hearing had meanwhile been postponed to July 12 because on July 10 the Court was engaged in another criminal trial.

**14.** The July 10 date had been established and recorded in two prior orders of the Court.

**15.** The prosecution insisted on yet a further delay, to July 17—a date which the prosecutor considered most appropriate from the point of view of his schedule and that of his experts. However, since the Court was to hold a long-scheduled trial on July 17, 1990, the additional request was denied. Defendant's expert furnished a copy of his written report to the other side in advance of the hearing; only one of the government's experts did.

**16.** Dr. Moldauer, a Ph.D. in psychology from George Washington University, and a licensed psychologist, had been an evaluator at the largest private institution for the retarded in the United States; he personally evaluated between 1,000 and 1,400 mentally retarded persons and supervised work on an additional 3–400; he is

presently on the faculty of George Washington University.

**17.** Dr. Shapiro, a Ph.D. from the University of Michigan, is in private practice, specializing in forensic psychology. He has held teaching positions at the University of Maryland and at American University and he has published extensively. Like Dr. Moldauer, he has many times testified as an expert.

**18.** Dr. Blumberg had never "specifically" testified as an expert on mental retardation.

**19.** Dr. Blumberg's written report, while lengthy, was in the main oriented toward such issues as the defendant's personal history, his personality traits, lack of a personality disorder, and the consequences to defendant's psyche of the beating he sustained while incarcerated. *See* Part IV, *infra.* Dr. Blumberg discussed at some length defendant's involvement in the offense, but his assessment of defendant's role was based entirely upon reports from law enforcement sources, even though the defense version was readily available (*e.g.*, in the court jacket and the Probation Office's presentence report). This factor casts additional doubt on Dr. Blumberg's assessment that "at the time of the current offense [defendant] was not suffering from a diagnosable mental disorder." Report, p. 7. Dr. Blumberg's one-sided data regarding the offense may account for that psychiatrist's finding, outside his own field of competence, that he "would find it extremely difficult, if not impossible, to believe that [defendant] was merely an unknowing dupe in the midst of the current cocaine operation to which he pled guilty." Report, p. 8.

Dr. Shapiro. As is not unusual in litigation, the experts differed both in their conclusions and in the factors which led them to these conclusions, although there were also some areas of agreement. Dr. Moldauer concluded on the basis of his examination of defendant and of the tests he gave to him, that defendant has an IQ of 59 [20]—clearly in the mentally retarded category, and in the lowest one percent in intelligence in the United States.[21] On the basis of his examinations and tests and his review of defendant's background, Dr. Moldauer determined that Adonis was mentally retarded, as defined in the standards established by the Diagnostic and Statistical Manual III as revised.

Dr. Shapiro, the government's expert, testified that defendant has an IQ of 64—five points higher than that found by Dr. Moldauer. However, significantly, the score assigned to the defendant by Dr. Shapiro is still below the 69 classified in the Wechsler Adult Intelligence Scale Revised [22] as that for mentally retarded persons. Dr. Shapiro also conceded on cross-examination that, by his measurements, Adonis' IQ places him in the lowest one percent of the United States population.

One difference between the two experts is even more telling. Dr. Moldauer's estimate, based upon the examinations he has conducted during his career, was that the average IQ score of criminal defendants generally lies in the mid- to upper 80s (compared to 100 for the population as a whole). Dr. Shapiro, by contrast, stated, based upon his experience, that the average IQ score of criminal defendants is in the low 70s, and that Adonis' score of 64 therefore was not particularly low.

It appears to the Court that Dr. Shapiro inflated Adonis' IQ (albeit not quite over the 69 dividing line) while deflating the IQ scores of criminal defendants generally, so as to arrive at a relatively narrow difference between the two. There is independent confirmation that Dr. Shapiro's estimate of the IQ scores of the criminal defendant population is wholly erroneous. According to the most comprehensive study of IQ levels and mental retardation among the prison population to date, the average IQ of this population is 93.2,[23] a figure which vastly exceeds the estimate given by Dr. Shapiro.[24]

The Court finds, based on the expert testimony, defendant's behavior at the scene of the offense, and his in-court demeanor and testimony that defendant is now and was on August 20, 1988, the date of the offense, suffering from significantly reduced mental capacity.

Section 5K2.13 of the Sentencing Commission guidelines provides as follows:

*Diminished Capacity (Policy Statement)*

If the defendant committed a nonviolent offense while suffering from signifi-

---

**20.** Dr. Moldauer broke this down into a Verbal IQ of 64 and a Performance IQ of 55.

**21.** Scores of 67 and below fall within the lowest one percent of all measured intelligence quotients.

**22.** This is the standard and most widely used and most complete measure for intellectual functioning.

**23.** Bertram S. Brown, M.D., and Thomas F. Courtless, Ph.D., "The Mentally Retarded in Penal and Correctional Institutions," American Journal of Psychiatry, V. 124, March 1968, p. 1166. This average was the result of a sample of 90,477 inmates from 207 penal and correctional institutions in the fifty states and the District of Columbia.

**24.** Although Dr. Shapiro conceded that his estimate was not based on a formal study, the difference between his estimate and the figure produced by this study is so great as to raise questions as to his credibility. Dr. Shapiro's testimony was slanted in favor of the side that had retained him even more than that of the usual expert in other ways as well. For example, Dr. Shapiro based his conclusion of defendant's malingering upon his having given him the name of Payne rather than Adonis. Upon further inquiry, Dr. Shapiro stated, inexplicably, that his malingering opinion would not be altered by the fact that use of this alias was not a subterfuge and that Payne is a name defendant "uses all the time." Tr. of July 16 at 16. Dr. Shapiro's testimony might also be questioned on the basis of his insistence that the low IQ of criminals could be attributed, at least in part, to the fact that many of them are black and therefore do not come from a culturally rich environment or sometimes lack educational opportunities.

cantly reduced mental capacity not resulting from voluntary use of drugs or other intoxicants, a lower sentence may be warranted to reflect the extent to which reduced mental capacity contributed to the commission of the offense, provided that the defendant's criminal history does not indicate a need for incarceration to protect the public.

The Court finds (1) that defendant committed a non-violent offense, (2) that the offense did not result from voluntary use of drugs or other intoxicants, and (3) that defendant's criminal history does not indicate a need for incarceration to protect the public.[25] Based upon the record of the hearing on July 13, 16, and 20, the experts' reports, and the entire record herein, the Court further finds that defendant committed the offense while suffering from significantly reduced mental capacity,[26] and that this reduced mental capacity contributed to a substantial extent to the commission of the offense.

Adonis' role in the offense was perfunctory at best. He was brought down from New York shortly before the offense by a friend who left him at an apartment in this city, with instructions not to let anyone in while the others were gone. There are strong indications that, due to his retardation, defendant had little, if any, appreciation of what was involved.[27] As indicated *supra*, at 338, Adonis' statement that prior to his co-defendant's arrival with the cocaine, he was unaware of any illegal drug transaction, is consistent with Scott's unequivocal acceptance of responsibility for the drugs. There is no indication that defendant has ever been involved in drug use or drug distribution in the past, or that he was more than tangentially involved in the instant offense.[28] Perhaps even more important, it appears that Adonis had never been to Washington, D.C. before, and it is clear from Dr. Moldauer's testimony that, in the absence of any special transportation training in travelling the route between New York to Washington, D.C. many times, Adonis would have been incapable, by himself, of extricating himself from the apartment upon learning of the existence of the drugs. *See* July 13, 1990 Transcript at 35–37.[29]

Although the Court initially sentenced defendant to imprisonment for three years based in part on its perception of defen-

---

**25.** The government does not contest any of these findings.

**26.** Dr. Moldauer testified that in his opinion Adonis was in all likelihood as impaired when he was involved in the offense as he was at the time he was tested in July 1990.

**27.** Defendant's comments to the probation officer as recorded in the pre-sentence report are a more than adequate factual basis for a conclusion as to his lack of involvement, contrary to the government's contention that without a successful interrogation of the defendant by its psychiatrist regarding the offense, no such conclusion could be reached. Given the prosecutorial treatment of the defendant, *see* Part VI, *infra*, as well as the fact that his attorney was not present, it is entirely understandable that the defendant did not want to discuss the offense, other than to reaffirm that he was "innocently in the wrong place at the wrong time." Blumberg Report at 8.

**28.** The testimony of the government's experts— that defendant proved himself to be a savvy individual because he complained that his handcuffs were too tight during the interview, and because he "played possum" when he was at-tacked by a group of inmates in the federal correctional institution at Lorton—is not evidence the Court finds even marginally persuasive. Even animals will react to pain and "play possum" when attacked by superior force—hence the expression—and such actions by a human being therefore do not negate his diminished mental capacity.

**29.** Dr. Moldauer based this assessment in part on Adonis' overall intelligence score and particularly on the fact that Mr. Adonis had unusually low scores on two subtests of the WAIS–R which measure practical social judgment and social perception. On the basis of this poor performance, Dr. Moldauer concluded that Mr. Adonis "has less of a capacity to understand what's going on around him, less of a capacity to deduce the motivations, the potential danger, potential legalities, or even be aware of the law with regard to a lot of what was going on. Moreover, because of his significantly reduced mental capacity, should he at some point decide, or have decided, or have wished to exit that situation, he would have been much reduced in his ability to do so, to do anything other than but go along with those who were around him, because he had no course of safe, reasonable independent exit he could pursue on his own." *Id.* at 37.

dant's somewhat limited intelligence, it was not aware of the much more substantial limitations facing the defendant that have now been revealed by expert testimony. Accordingly, upon consideration of the evidence received at the hearing on the issue of defendant's mental capacity and the entire record, the Court hereby departs pursuant to section 5K2.13 of the guidelines [30] from the sentence otherwise provided for, and sentences defendant to imprisonment for a period of two years,[31] followed by three years of supervised release, and a $50 victim assessment fee. That downward departure is also justified on several additional bases, as discussed at pp. 338–39, *supra*, and Parts IV and V, *infra*.

## IV

■ Section 5H1.4 of the guidelines provides that, while physical condition is not ordinarily relevant for a departure, "an extraordinary physical impairment may be reason to impose a sentence other than imprisonment." It has been held that this guideline provision, while speaking directly of an alternative to imprisonment, "does not preclude the possibility that impairment might also warrant a shorter sentence." *United States v. Ghannam*, 899 F.2d 327 (4th Cir.1990). Likewise relevant here is *United States v. Morales*, 905 F.2d 599 (2d Cir.1990), which upholds a departure from the guidelines based on the "extreme vulnerability" of the defendant in a correctional institution.

Apparently because of his limited intelligence and his status as a retarded person, defendant was attacked on February 22, 1989, at the Lorton reformatory by a group of seven prisoners and savagely beaten, including with an iron pipe. As a consequence, defendant suffered severe head trauma, possibly brain damage.[32] As a consequence, defendant cannot sleep at night; he is frightened; when he sleeps during the day he suffers from nightmares; he has experienced headaches, and he believes that he is losing sight in his left eye. Even the government's own psychiatrist found symptoms consistent with the diagnosis of a Post–Traumatic Stress Disorder, and he reported that defendant was "feeling anxious much of the time as a result of the beating he received," and that he experiences sleep disturbance with nightmares, "along with fearfulness that he will be killed if he falls asleep at night."[33] In addition to these problems, defendant has also been tested positive on an examination for tuberculosis,[34] and he is now on medication for that disease.

There is no question but that this beating occurred,[35] or that retarded inmates are frequently the victims of this and other types of abuse from other inmates.[36] The Court therefore finds that the defendant is extremely vulnerable to further attack, and on that basis it has determined that a departure from the otherwise applicable guideline sentence is also warranted pursuant to section 5H1.4 of the guidelines and the *Ghannam* and *Morales* decisions, *supra*. The Court therefore concludes that a sentence of imprisonment for a period of

---

**30.** *See United States v. Spcight,* 726 F.Supp. 861 (D.D.C.1989); *cf. United States v. Poff,* 723 F.Supp. 79 (N.D.Ind.1989).

**31.** The two-year sentence is also justified by the considerations recited in note 37, *infra*.

**32.** Report of Dr. Moldauer at p. 2.

**33.** Report of Dr. Blumberg at p. 6.

**34.** The medical records at Danbury, Connecticut and Oakdale, Louisiana, apparently indicate that in May 1989, when defendant complained of cramps in his arms and legs, of headaches, and of shortness of breath, he was referred to the pulmonary clinic where he registered a posi-

tive PPD (which means that he had been exposed to the TB bacillus), and he was placed on INH medication. In May of 1990, defendant complained of headaches, backpain, chills, night sweats, loss of weight, and dry cough, but he was given no further treatment.

**35.** It is recorded in the records at the Lorton correctional institution, and the Federal Bureau of Investigation is presently investigating the matter.

**36.** *See, e.g.,* Willy Rideau and Billy Sinclair, "The Mentally Retarded Offender," Journal of Prison and Jail Health, Fall–Winter 1983, Vol. 3, No. 2, p. 103; Leslie Whitaker, "Prison Reform for the Mentally Handicapped," Texas Observer, Sept. 16, 1983, pp. 7–9.

two years is appropriate,[37] followed by three years of supervised release.

## V

As indicated *supra* at pp. 337–38, defendant was originally charged with possession of more than fifty grams of cocaine base with intent to distribute and with a drug conspiracy, carrying a maximum of over fifteen years of imprisonment. It was the government's demand as part of a plea bargain that defendant forego a hearing on a motion to suppress evidence he had filed. To obtain the benefit of the plea bargain, he did just that. As the Court of Appeals noted, "this episode raises a question as to whether the government offered the plea in order to sidestep a suppression hearing." Court of Appeals slip opinion at 301 n. 3; *see also*, Opinion at 304 n. 6.

Prosecutorial coercion to surrender a constitutional right does not normally result in a reduction of the sentence. In theory, the Court could, however, set aside a plea so secured as coerced, and permit the defendant to proceed to trial instead. *See* Rules 11 and 32(d), Fed.R.Crim.P.

■ The fact that defendant has not moved for withdrawal of the plea under Fed.R.Crim.P. 32(d), or for relief under 28 U.S.C. § 2255, is evidence neither of lack of coercion nor of the appropriateness of conditioning a plea bargain on the abandonment of a constitutional right. Rather, defendant's failure to raise the issue is attributable to the condition imposed by the prosecution with respect to the plea bargain, in conjunction with the prosecution's discretion to determine whether, in the absence of a plea bargain, defendant will face fifteen years or five in prison. This constitutes a type of coercion heretofore unconfronted by the criminal justice system.[38]

■ The remedy of a withdrawal of a guilty plea in the context of a proffered plea bargain is normally a choice that the defendant is reasonably capable of exercising without draconian consequences.[39] However, that remedy is illusory under the guideline system which vests extraordinary and unprecedented power in the prosecution. If the guilty plea is set aside, the prosecution could, and no doubt would, reinstate the original charge, or bring several even more serious ones. In so doing, the prosecution could not only select, as in the past, the statutory exposure to punishment the defendant would be facing, but the precise sentence that will have to be imposed. For a discussion of the manipulation options available to the prosecution in this regard, *see United States v. Roberts*, 726 F.Supp. 1359, 1362–68 (D.D.C. 1989); *United States v. Holland*, 729 F.Supp. 125, 131 (D.D.C.1990); and *United States v. Boshell*, 728 F.Supp. 632, 637 (E.D.Wash.1990).

For that reason, to set aside the guilty plea on account of the coercion represented by the demand that defendant waive his Fourth Amendment rights,[40] would be to

---

**37.** Defendant has already served twenty-three months of the sentence the Court previously imposed. The present two-year sentence should minimize his exposure to further assaults. Further to prevent such attacks, the Court recommends to the Bureau of Prisons that defendant be given special placement or, if none is available, that he be held in solitary confinement during the remainder of his term. *See Morales, supra.*

**38.** Counsel for Adonis' co-defendant Scott indicated precisely that, stating that in the circumstances, there was no choice but to accept the government's offer of a guilty plea. *See* Transcript of December 12, 1988 at 2–3.

**39.** In view of the sentencing discretion traditionally vested in the court, the judge could by and large sentence in accordance with the defendant's actual conduct, as distinguished from a numerically pre-decided sentence.

**40.** Defendant's motion to suppress may well have had merit; certainly it was not frivolous. On August 20, 1988, police officers received a "911" call from an unidentified caller that a burglary was in progress at 3341 22nd Street, S.E., Apartment 202, the apartment where Scott and Adonis were visiting, although there is some dispute as to the exact apartment number given. A sergeant of the Communications Division of the Police Department interviewed the caller, a tenant of the building, who stated that persons indicated to her household that they were guests of the residents at apartment 202, that they needed a key to get in, and that her thirteen-year old daughter gave them the key, apparently with her permission.

penalize the defendant rather than to provide him with a real remedy. If there is to be any remedy for the coercion with respect to defendant's constitutional rights, therefore, it will have to be in the area of the duration of the sentence, or there will be none.[41]

18 U.S.C. § 3553(b) provides that a court may depart from the guideline sentence by taking aggravating or mitigating circumstances into account if such circumstances were not adequately taken into consideration by the Sentencing Commission in formulating the guidelines. None of the guidelines consider the effect of a coerced abandonment of the constitutional protection against illegal search and seizure. Yet in view of the considerations discussed above, most particularly the fact that the government's condition at the plea bargain ensured that, unless its violation of the Constitution is taken into account at the sentencing stage, it will not be taken into account at all, the Court will depart downward from the guideline sentence to the extent described at pp. 342–43, *supra.*

## VI

■ During the hearing of this matter, counsel for the defendant complained to the Court that Assistant U.S. Attorney William O'Malley was guilty of serious prosecutorial misconduct in this case, in violation of Disciplinary Rule 7–104 of the District of Columbia Code of Professional Responsibility.[42] DR 7–104(A)(1) provides that a lawyer may not communicate on a subject of the representation with a party unless he has the prior consent of the lawyer representing such party. It was claimed by defense counsel that Mr. O'Malley was present at parts of the interviews he arranged for the defendant with Dr. Blumberg and Dr. Shapiro, and that on these occasions he asked questions of the defendant and gave instructions to him, all without ever notifying defendant's counsel or giving him an opportunity likewise to be present. Evidence was taken on this subject as part of the hearing on the motion for resentencing, in connection with defendant's request for a departure or for a dismissal of the charges. The defendant, Mr. O'Malley, Dr. Shapiro, Dr. Blumberg, and two other witnesses testified on the alleged prosecutorial misconduct.

The evidence showed that Assistant U.S. Attorney O'Malley on two occasions ordered a "come-up" of the defendant from the D.C. Jail to the offices occupied by the U.S. Attorney in the United States Courthouse, for the purpose of interviews with Dr. Shapiro and Dr. Blumberg.

---

There is a dispute as to what occurred when the police arrived at apartment 202. According to the defendants, the door was closed, the police did not knock, but simply opened the door and gained entrance. According to the police, they found the door slightly ajar, observed Scott standing and Adonis sitting, identified themselves, entered, and searched. In their motion to suppress, defendants contended that, as invited guests of the resident occupant of apartment 202, they had a reasonable expectation of privacy and standing to challenge the search there, *see United States v. Robinson,* 698 F.2d 448, 454 (D.C.Cir.1983); that there was no probable cause for the search; that given the information provided to the non-searching officers, the search could not be based on the "exigent circumstances" exception to the warrant requirement; and that the search was not reasonable because the officers failed to knock before entering. *See Miller v. United States,* 357 U.S. 301, 308–09, 78 S.Ct. 1190, 1195, 2 L.Ed.2d 1332 (1958) (in ordinary circumstances, officer is required to state both his authority and purpose before entering premises).

By being confronted with the choice of giving up the opportunity to litigate whether these events violated his Fourth Amendment rights and of seizing that opportunity and being charged with violation of laws carrying much heavier sentences, defendant was given the choice like that of Odyssens' choice between Scylla and Charybdis—no choice at all. The Constitution does not compel so desperate a gamble.

**41.** Deterrence of unreasonable searches and seizures is a major purpose of the exclusionary rule. *See United States v. Calandra,* 414 U.S. 338, 348, 94 S.Ct. 613, 620, 38 L.Ed.2d 561 (1974); *United States v. Janis,* 428 U.S. 433, 446, 96 S.Ct. 3021, 3028, 49 L.Ed.2d 1046 (1976); *United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984); *United States v. Mount,* 757 F.2d 1315, 1317 (D.C.Cir.1985).

**42.** *See also,* Local Rule 706(a) of the Rules of this Court.

While there is some dispute about the precise sequence of events, most of the relevant facts are not in serious contention. On both occasions, Mr. O'Malley was present at the start and at the conclusion of the expert consultations, but he did not remain for the bulk of those consultations and examinations. Mr. Jensen Barber, defendant's counsel, was not present on either occasion, nor was he afforded an opportunity to be present.[43]

Mr. O'Malley had the defendant brought up to the sixth floor U.S. Attorney offices by police officers, and each time he was personally present at the elevator when defendant arrived. He would exchange a few words with defendant, he would introduce the defendant to the psychiatrist and the psychologist respectively, he would admonish defendant to answer all the questions, and he would leave, to return at the conclusion of the examination. In addition to the circumstance that all of these events occurred without defense counsel's knowledge or presence, a serious problem arises in connection with Mr. O'Malley's conduct at the conclusion of defendant's examination by Dr. Shapiro on July 12, 1990.

It appears that the defendant did not want to discuss the circumstances surrounding the offense with Dr. Shapiro (or with Dr. Blumberg several days earlier), stating that "what is past or past," or words to that effect. When the consultation was completed, Mr. O'Malley spoke to the defendant—according to O'Malley in conversational tones, according to Dr. Shapiro in a firm voice, according to defendant[44] by shouting[45]—asking him why he would not discuss the offense.[46] When the defendant again said something about the past being the past, O'Malley asked, according to Dr. Shapiro, "Are you not discussing it because your attorney told you not to discuss it?" Tr. of July 20 at 43. In addition to these events, the defense brought out that O'Malley personally handcuffed the defendant with his hands behind his back when the examination was concluded—an extremely unusual task for an attorney.[47]

The question is whether this conduct was improper. Disciplinary Rule 7–104[48] prohibits unilateral contact between a lawyer and an opposing party who is represented by a lawyer on a subject of the representation without that lawyer's consent.[49] Nor

43. Mr. O'Malley did leave a telephone message and he did write to Mr. Barber that the defendant would be examined by a psychologist and a psychiatrist, but he did not advise him when and where this would take place, and notably, he did not inform Mr. Barber that the prosecutor himself would also be there, let alone that he would talk to the defendant. Although Mr. O'Malley informed the Court that he advised defense counsel in writing that "I intended to interview [the defendant]" (Tr. July 13 at 16), this is untrue.

44. According to the defendant, when Dr. Shapiro was finished with him, O'Malley came back into the room and "he asked me—he started shouting: why don't I answer the questions. About approximately it was four times: why don't I want to answer the questions," and again, "he asked me: why—shout at the top of his voice: why didn't you answer all the questions...." Tr. of July 20 at 12, 16. See also, Tr. at 23–24.

45. While the Court might not normally credit the defendant's account over that of the others, that account was corroborated circumstantially. For example, there was Mr. O'Malley's imperious conduct when dealing with Adonis, such as

when he commanded the manacled defendant who was standing, looking down, in an unaccustomed environment, without the protection of counsel, to "look at me when I am speaking to you."

46. Dr. Shapiro initially testified that Mr. O'Malley "asked Mr. Adonis some questions about the offense," but he then corrected himself, stating that the prosecutor asked only why the defendant would not discuss the offense. Tr. of July 13 at 78.

47. O'Malley, who thought that defendant's complaints in regard to the handcuffs were "funny," Tr. of July 13 at 10, testified that in some twenty years as an Assistant U.S. Attorney he had never performed such a task. Dr. Shapiro likewise stated that he had never seen a prosecutor handcuffing a prisoner. Tr. of July 20 at 45–46.

48. See also, Rule 4.2 of the ABA Model Rules of Professional Conduct, a virtually identical rule.

49. The government argues that Mr. O'Malley's contact with the defendant was not on the subject of the representation, but it is difficult to take that argument seriously. The precise subject of the representation was defendant's re-

does the government rely on possible immunity from the Rules of Professional Responsibility. In response to the Court's inquiry whether the government was relying on a memorandum issued on June 8, 1989 by Attorney General Richard Thornburgh, purporting to exempt Department of Justice litigators from compliance with Rule 4.2 of the ABA Model Rules of Professional Conduct, on the basis of federal supremacy over local disciplinary rules, the response was a negative.[50]

Counsel for the defendant requests that the Court dismiss the charges against him on account of this prosecutorial misconduct. However, there is no authority for doing so at this stage of the proceedings, where the misconduct did not and could not interfere with a fair trial or where the misconduct is not entrenched or longstanding.[51] Similarly, although the Court does not find the instant conduct sufficiently related to the sentencing proceeding to constitute independent grounds for a departure from the guidelines, the conduct solidifies the Court's decision to depart downward from the guideline sentence for the reasons specified in the previous sections.[52]

quest for resentencing on account of diminished capacity, and the psychological examinations bore most directly on that issue. Indeed, as noted, Mr. O'Malley even inquired of defendant of the circumstances of the offense and on the advice his attorney had given him.

**50.** It could hardly be otherwise, for the disciplinary rules were adopted by this Court by way of its Local Rule 706(a). Whatever may be the effect of the Constitution's Supremacy Clause with respect to local disciplinary bodies—an issue on which the courts appear to be divided (*compare United States v. Klubock*, 832 F.2d 664, 665–68 (1st Cir.1987), with *County of Suffolk v. Long Island Lighting Co.*, 710 F.Supp. 1407, 1414 (E.D.N.Y.1989))—that Clause obviously does not establish a memorandum issued by the Attorney General as supreme over rules issued by a federal court.

**51.** *See United States v. Hasting*, 461 U.S. 499, 505–07, 103 S.Ct. 1974, 1978–79, 76 L.Ed.2d 96 (1983), *United States v. Morrison*, 449 U.S. 361, 365–66, 101 S.Ct. 665, 668–69, 66 L.Ed.2d 564 (1981), *Mathies v. United States*, 374 F.2d 312 (D.C.Cir.1972), *United States v. Broderick*, 425 F.Supp. 93, 96 (S.D.Fla.1977), and *United States*

## VII

If judges were still free to sentence in accordance with their understandings of justice and individual responsibility, there would be few, if any, members of the Federal Bench who would not take the factors enumerated and discussed above into account, at least to some extent. However, as the Court explained in *Roberts, supra,* the prosecution has in substantial measure assumed de facto control of the sentencing function as a consequence of the interplay between its freedom to charge largely as it wishes, and the fixed, numerical sentences the court must now impose depending upon the charge under the Sentencing Commission guidelines.

As the Court also observed in *Roberts,* this prosecutorial control is not always exercised in accordance with the dictates of fairness, and this case illustrates that point. Here, the sole response of the prosecution to pleas for some consideration on account of the factors discussed above—Adonis' mental retardation, his possible brain damage as a consequence of an attack in prison and his exposure to further attacks on account of his mental deficiency, his tuberculosis, his relatively insubstantial

*v. Omni Int'l Corp.*, 634 F.Supp. 1414, 1436–40 (D.C.Md.1986).

**52.** Defense counsel has also informed the Court that, in view of a report to the House of Delegates of the American Bar Association condemning the Thornburgh policy, he wished to bring to the Court's attention that similar unauthorized conducts between the prosecutor's office and individual defendants have allegedly occurred more than once in recent months in this District. According to counsel, "in the last couple of months [it has been of] great concern to the defense bar because the United States Attorney's Office here seems to feel that they can, without exception, call clients who are represented by attorney up for interviews, have then brought up from jail and to with them as they will." Tr. of July 16 at 61. Counsel went on to say that, if requested by the Court, he would undertake an examination of this issue with the local defense bar and provide the Court with his findings.

Since the problem is claimed to transcend the instant case, the only one over which this Court has jurisdiction, it would not be appropriate to single out the conduct here, and the Court will leave the matter for action, if any, by others.

role in the offense, his possible defense to the charges on account of a Fourth Amendment violation—has been the equivalent of "we don't have to." Thus, this case, like those discussed in *Roberts* and *Holland,* demonstrates how far the system has been allowed to stray from the traditional model of sentencing in accordance with equity and just deserts.[53] Moreover, the events of this case support what this Court has been noting since *Roberts*—that to vest the bulk of the sentencing authority in partisan prosecutors rather than dispassionate judges is bound to do harm to the maintenance of due process in the criminal justice system.

---

**53.** Courts are often importuned by criminal defendants, particularly in white collar cases, but also in others, that the defendant has "suffered enough." Such a plea would surely be realistic here.