UNITED STATES of America

v.

Jose MENA, Defendant.

No. 96 CR 1043–01(JBW).

United States District Court,
E.D. New York.

July 2, 1997.

3.   The Court has not, therefore, reached the other arguments proffered by Defendant as grounds for his motion to dismiss.

**116**

Zachary W. Carter, U.S. Attorney by Michelle DeLong, Brooklyn NY, for United States.

The Legal Aid Society, Federal Defender Div., by Cynthia Matthews, Brooklyn, NY, for Defendant.

## Memorandum and Judgment

WEINSTEIN, Senior District Judge:

A substantial downward departure under the Sentencing Guidelines is required for the reasons set forth below.

Defendant, a thirty-two year-old citizen of the Dominican Republic, pled guilty to conspiracy to distribute and possess with intent to distribute cocaine in violation of sections 841(b)(1)(C) and 846 of title 21 of the United States Code.

Defendant was born and raised in the Dominican Republic. He attended school through the sixth grade, met with little academic success, and dropped out at the age of fourteen to obtain a job. He has not matriculated since.

Because defendant's full scale I.Q. is 67, he falls within the mildly mentally retarded range of intellectual functioning. This I.Q. is surpassed by well over 98% of the general population. According to a March 1997 psychological evaluation performed by a certified and licensed psychologist, defendant's thinking is characterized as naive, child-like, concrete and simplistic. The unchallenged psychologist's report states that defendant tests as a person who is easily overwhelmed, is highly dependent on others, and tends to excessively look to others for approval, reassurance and direction because he has few inner resources to draw upon when confronted with new or challenging situations. He was also found to be prone to suggestibility and gullibility. See Report of Alan M. Goldstein, Ph.D., March 8, 1997. The court observed the defendant to be unusually self-effacing and shy.

He is, by his common law wife of ten years, the father of two small children: a seven year-old boy and a twenty-one month-old girl. Defendant came to New York in search of a better standard of living approximately four years ago, at which time he moved into his older brother's small apartment. His wife joined him the next year, moving into the apartment while defendant's brother moved out. Their seven year-old is being reared by his maternal grandmother in the Dominican Republic, and their daughter was sent there after defendant's arrest and incarceration due to the financial and supervision difficulties presented by her staying in New York with her mother. Prior to his arrest, defendant earned a meager living—approximately $400 a month as an Amway salesperson. The couple had no assets. After the arrest, defendant's wife took a job as a hairdresser. She is despondent to the point of nervous breakdown.

Defendant's arrest and guilty plea stems from his involvement in a plan with two other individuals—one of whom was his older brother—to purchase 100 kilograms of cocaine. Defendant's brother remains a fugitive. The other co-conspirator has been arrested and awaits sentencing. Defendant's brother and the co-conspirator hatched the plan to purchase the cocaine. They initiated contact, unwittingly, with a government informant to arrange it. They conducted over twenty conversations with the informant, none of which involved the defendant. Defendant attended only one meeting—at a dinner the day before the planned cocaine transfer—at which defendant's co-conspirator gave the informant a bag of money. Defendant was present the next day for the transfer, and was arrested at that time.

Although defendant characterized his relationship with his older brother as having been excellent, he was dominated and manipulated by him. His brother first began to persuade defendant to participate in the planned cocaine purchase about three months before the arrest. During the time leading up to the arrest, his brother continued to pressure him, asserting that his participation would earn him enough money to open his own hair salon—defendant's long-held aspira-

tion. He has no knowledge of his brother's present whereabouts.

The base offense level for this violation of sections 841(b)(1)(C) and 846 of title 21 is 36, requiring a sentence between 188 and 235 months imprisonment for an offender who, like defendant, is in criminal history category I. U.S.S.G. § 2D1.1(a)(3). He is entitled to a number of downward adjustments. His participation in the scheme was minimal, requiring a reduction of 4 levels. U.S.S.G. § 3B1.2(a). Because defendant pled guilty and notified the government of his intention to do so in a timely manner, an adjustment for acceptance of responsibility is appropriate, resulting in an additional reduction of 3 levels. U.S.S.G. § 3E1.1(b)(2). The safety valve is also applicable, resulting, as the government concedes, in another 2 level reduction. U.S.S.G. §§ 2D1.1(b)(4) and 5C1.2. Defendant agreed to voluntary deportation, entitling him to an additional reduction of one level. As a result, the total offense level is 26; the Guidelines call for a sentence of 63 to 78 months imprisonment.

There are a number of bases for discretionary downward departure. *See* U.S.S.G. § 5K2.0; *United States v. Joyner*, 924 F.2d 454, 461 n. 3 (2d Cir.1991) (extraordinary mental or emotional condition grounds for downward departure). First, the Sentencing Commission provides that "if the defendant committed the offense because of coercion, blackmail or duress ... the court may decrease the sentence below the applicable guideline range." U.S.S.G. § 5K2.12 (coercion and duress). An element of coercion exists in the instant case. Defendant was dominated by his older brother who succeeded in manipulating him into participation in the scheme through inducements of seed money to open his own store, among other things. Defendant's closeness to his brother, his propensity to seek his sibling's approval, his suggestibility, gullibility, dependence and mild mental retardation made resistance to his brother's overtures virtually impossible.

Defendant is also entitled to a discretionary downward departure pursuant to Guideline section 5K2.13. That section provides that a lower sentence may be appropriate for a defendant who commits a nonviolent offense while suffering from "significantly reduced mental capacity ... which ... contributed to the commission of the offense." U.S.S.G. § 5K2.13. The court of appeals, in *United States v. Prescott*, held that a departure pursuant to § 5K2.13 is warranted where the court finds a causal link between the defendant's reduced capacity and the commission of the charged offense. *United States v. Prescott*, 920 F.2d 139, 145 (2d Cir.1990). The causal link exists here. Defendant, given his borderline I.Q., did not, at the time of commission, understand the significance or repercussions of his actions. As Dr. Goldstein, the examining psychologist, reported:

> [defendant's] low level of intellectual functioning, his concrete thinking and defects in reasoning interfered with his ability to fully comprehend all of the legal and punitive consequences of his act. Mr. Mena apparently struggled with the decision to participate but, his low level of intelligence and the ease with which he is manipulated played a major role in his involvement in this crime.

Report of Alan M. Goldstein, March 8, 1997, at 5.

Defendant is also entitled to a discretionary downward departure because his mental retardation makes him vulnerable to attack while incarcerated. In *United States v. Lara*, the court of appeals held that a sentencing court may downwardly depart where a defendant has the "potential for victimization." *United States v. Lara*, 905 F.2d 599, 602–03 (2d Cir.1990). There, the court of appeals noted that a defendant's mental, emotional and physical condition may render him or her vulnerable to attack. *Id.* Given defendant's appearance, reaction to stress, suggestibility, gullibility and dependence, he will probably make a poor adjustment to prison. He is particularly susceptible to abuse and manipulation by other inmates. He is an easy target, and likely to be preyed upon. *See, e.g., United States v. Adonis*, 744 F.Supp. 336, 343 (D.D.C.1990) ("Retarded inmates are frequently the victims of [beating] and other types of abuse

from other inmates"); *cf.* T. Howard Stone, Therapeutic of Implications of Incarceration for Persons with Severe Mental Disorders: Searching for Rational Health Policy, 24 Am. J.Crim.L. (1997).

■ Finally, the need for defendant to provide for and support his family both financially and emotionally, as he has done in the past, militates in favor of a discretionary downward departure. *Cf. United States v. Johnson,* 964 F.2d 124, 128–29 (2d Cir.1992) ("we are reluctant to wreak extraordinary destruction on dependents").

For each of the foregoing reasons, independently as well as in combination, the court departs downward 15 levels. Defendant is sentenced to time served—eight and a half months. He is to be released into the custody of the Immigration and Naturalization Service for immediate deportation. A special assessment of $100 is imposed. Defendant shall be subject to supervised release for a term of three years; the term need not be served in this country.

This sentence is stayed for ten days to permit the government to seek a stay of deportation or other relief from the court of appeals pending any appeal. *See United States v. Londono,* 100 F.3d 236 (2d Cir. 1996).